[Civ. No. 8788. Third Dist. Apr. 14, 1955.]

FRED PODESTA et al., Respondents, v. LINDEN IRRI-GATION DISTRICT et al., Defendants; THE STOCK-TON AND EAST SAN JOAQUIN WATER CONSER-VATION DISTRICT, Appellant.

Neumiller, Ditz, Beardslee & Sheppard, Neumiller, Ditz & Beardslee and Robert N. Barbour for Appellant.

William Biddick, Jr., City Attorney (Stockton), as Amicus Curiae on behalf of Appellant.

Jones, Lane, Weaver & Daley for Respondents.

VAN DYKE, P. J.—Petitioner, The Stockton and East San Joaquin Water Conservation District, has appealed from a judgment which in part restrains it from using a watercourse through respondents' land to flow water stored in an upstream reservoir. This court is asked to issue its writ of supersedeas with respect to that injunction order.

Petitioner is a public corporation organized under the laws of the State of California and its included lands are located in San Joaquin County. It is organized under Deering's General Laws, Act 9127c, as amended, and is given the right of eminent domain. It has powers to conserve and store water by acquiring dam sites, reservoirs, canals, ditches, etc.

Plaintiffs, respondents here, are the owners of some 600 acres of highly developed orchard land through which there

is now, or was formerly, a channel of the Calaveras River. The watershed drained by the Calaveras River has a maximum elevation of 4,000 feet and the flow of the river consists almost entirely of rainwater falling on the upper elevations of the shed. Plaintiffs' lands lie east of Linden and west of the foothills. The Calaveras River leaves the mountains and enters the plains near Bellota. Shortly before it reaches the lands of the plaintiffs it divides into Mormon Slough and North Slough, which latter slough is the one that goes through the lands of respondents. It appears without conflict that this separation of the channels has a long history; and that by natural processes the North Slough, which at one time was the main river channel, has silted up near its mouth, the process extending downstream in diminishing extent until past the plaintiffs' lands. By this natural process the bed of North Slough had by the turn of the century reached an elevation about 10 feet above that of the bed of Mormon Slough, with the result that the only waters which were flowing down North Slough were the crests of floods, the body of which proceeded down Mormon Slough. Owing to the flash nature of the stream, such flood waters entered North Slough at rare intervals in a year.

Prior to 1934 respondents had been able to cross the dry bed of North Slough at many places as it went through their lands, with their farm equipment of various kinds, including trucks, heavy tractors and the like. Shortly before that time, however, defendant Linden Irrigation District was formed, embracing a part of the same land now contained within the boundaries of the appellant conservation district, and it proceeded to implement a plan for the use of waters from the Calaveras River to irrigate the lands within that district, which included the lands of respondents. In 1930 the city of Stockton had completed a regulating dam on the Calaveras River known as Hogan Dam located about 30 miles up the Calaveras River east of respondents' lands. The purpose of this dam was to regulate the flood flows in the river and for that purpose it was pierced with various openings calculated to allow only so much water down the channel of the river as could be accommodated by Mormon Slough. The channel of this latter stream had as a part of the same plans of the city been rectified and charted around the city limits to prevent its waters at flood from entering the city. The Linden District's plans envisioned the use of Hogan Dam for storage purposes and it obtained contractually the consent of the

city to use the dam. A fundamental part of this plan, however, was to take water out of Mormon Slough and put it into North Slough and thence carry it to the lands within the Linden District so that, by direct pumping onto the lands and by percolation, the lands could be irrigated and the water table raised. This table had been steadily falling due to excessive pumping. Linden District obtained orally the consent or license of respondents to use North Slough through respondents' lands for this purpose. The district, starting at the junction of North Slough and Mormon Slough, excavated the bed of North Slough at grade down to the point where at the junction it equaled the elevation of the bed of Mormon Slough; thence continuing within the banks of North Slough until, at a point approximately at the west line of respondents' lands, no further excavation was needed because from that point on the bed of North Slough was not above the grade to which the easterly part of the channel had been excavated.

As a condition of entering upon respondents' lands, the district orally agreed that it would construct two bridges across the channel within respondents' land, and a third bridge across what is called the Lewis property lying to the west of respondents' boundaries as then existing, in order that the channel could be conveniently crossed for all farming purposes. On the Lewis property one bridge already existed and this bridge the district reconstructed and brought into good condition. There was an old bridge on respondents' lands also which received the same treatment and one completely new bridge was built. The Linden project was not wholly successful, the amount of water being short of the needed supply and subject to such pumping by farmers and stockmen whose lands lay between the district and the Hogan Dam as to seriously deplete the available water. About 1936, therefore, the Linden District ceased to use the channel and for 13 years made no effort to send water down it. By that time, by natural processes again, that portion of North Slough which lay between the westerly line of respondents' lands (they having in the meantime purchased the Lewis property) and the point where the river separated into Mormon Slough and North Slough was refilled with silt, so that again, at the junction, the bed of North Slough was raised so far above that of Mormon Slough that only the crests of the floods could enter. In fact, there is considerable evidence that due, in part, to the lowering of the flood crests by the operation

of Hogan Dam the water in the river entered North Slough only a few days in a year and for periods of about 48 hours. Respondents resumed the use of the dry channel for crossing back and forth between the north and south parts of their lands for all farming purposes.

In 1948 appellant conservation district was organized and it included much more territory than had been included within the Linden District. The city of Stockton was within the new district and has not been included in the Linden District. Appellant district made arrangements with the city of Stockton for the augmented use of Hogan Dam as a storage dam. It expended considerable sums in placing control gates in the openings that had been left in Hogan Dam so that more accurate control of floods could be exercised, with the result that many thousands of acre feet of water could during the course of a season be stored beyond the flood period and thereafter used much as the Linden District had attempted to use the water. Appellant made no contract with respondents and, without obtaining any consent, cleaned out the channel as it had been dredged by Linden District. By that time the bridges were in bad condition and appellant made no effort to repair them. Respondents served notice upon appellant that unless it repaired and undertook in writing to keep in repair the bridges across North Slough the leave or license under which Linden District had built and maintained the bridges would be revoked, it being the position of respondents that the acts of appellant in entering upon respondents' lands to dredge out North Slough and its acts in bringing water down from the dam were without right and unlawful. Appellant ignored this notice and continued with its acts and from that time until the present has each year stored water behind Hogan Dam and has brought it down to the lands within its boundaries through North Slough. As an aid in doing this it constructed a weir across Mormon Slough downstream from its junction with North Slough, thus elevating the water in Mormon Slough to aid in causing it to flow down the channel. It began flowing water down the channel of North Slough in fruition of this general plan of conservation in 1950 and has continued to do so ever since. It was shown in evidence that many farmers were pumping water from the channel, thus lessening the drain on the underground water; and that by depositing this water from the channel directly upon the lands, and by percolation of water from the channel, the water table was being steadily

raised. The foregoing is sufficient to show the situation which existed when the judgment appealed from was rendered.

By their complaint respondents alleged the foregoing in substance, asserting that appellant's acts had been without rights, and further alleged that due directly to the acts of appellant in diverting water in excess of the natural flow through North Slough their lands had been severed into two parcels and that the value of their holdings had been reduced in the sum of $77,000. They prayed for a judgment in that sum and also asked that "defendants be enjoined from introducing foreign water into said watercourse in excess of its natural flow as it existed prior ot 1933."

By its findings the trial court found generally the facts above recited, and specifically further found the following: That the deepening of the channel of North Slough across the lands of plaintiffs was an integral part of the district's general project to increase the flow in North Slough for public use; that said project would not be effective without the deepening and excavation of the channel on respondents' lands; that the effect of the operation of the entire project since 1949 had been to cause the water to flow from the main channel of Calaveras River into North Slough for public use almost continuously throughout the year; that said water had continued to so flow until the trial of the action; that since the first of January, 1949, the appellant "has furnished irrigation water from the North Slough without cost to numerous landowners within its boundaries whose lands adjoin the North Slough; . . .; that since the 31st day of May, 1953, the direct effect of said continuous flow of water through the excavated channel on plaintiffs' lands has been to sever the lands of the plaintiffs into two separate parcels [this date of May 31, 1953, refers to a finding that the date marks the time when the existing bridges became incapable of safe use] ; that said lands have continued to be so severed until the trial of this action"; that the value of respondents' lands in an unsevered condition was and since May 1, 1949, had been $840,000, and that the severance had reduced the value by $77,000.

Among the conclusions of law we find the court declaring that the appellant had no right to sever the lands of respondents by diverting water through the excavated channel of North Slough and through their lands; that any consent for such diversion was terminated by May 1, 1949, and "that the continued diversion by the defendant, Stockton and East

San Joaquin Water Conservation District, since the first day of May, 1949, and the severance of plaintiffs' lands since May 31, 1953, constitutes a taking and damaging of private property for public use without just compensation having first been made to the owners.'' By the judgment appealed from it is decreed that the respondents have judgment against appellant in the sum of $77,000, with interest thereon at 7 per cent from May 31, 1953; that said sum be paid within 30 days after final judgment in the cause. The judgment contained further provisions that if bonds had to be issued by appellant the payment date would be extended. It was further decreed that upon the payment of $77,000 respondents would have to execute a grant of an easement to appellant for the doing of the same things it had been doing. It was then provided that ''until the acquisition of a right of way'' through North Slough by the appellant where North Slough passes through respondents' lands the appellant be enjoined from introducing water into the slough in the excavated channel through respondents' lands in excess of the natural flow as it had existed since 1900, and the judgment declared that this natural flow consisted ''of freshets or flood water flowing in said channel for four days a year.'' It is clear from what had been said that this injunctive decree, if enforced, and so long as enforced, would completely stop appellant's entire project of water conservation according to its existing and implemented plans. However, said the court, if appellant wanted to continue to use the excavated channel through the respondents' lands pending any appeal, and if it should during such appeal comply with the provisions of section 1254 of the Code of Civil Procdure, the injunctive order would be suspended during the time of such compliance. The judgment further provided that the appellant could, by filing with the court its written election to abandon its project of taking water through the excavated channel over the lands of respondents, have the money judgment reduced to an amount representing interest at 7 per cent per annum upon the $77,000 award, from May 31, 1953, to the date of the filing of said election.

Appellant asks this court to issue a writ of supersedeas operative pending appeal, whereby the injunctive features of the judgment shall be suspended, with the result, of course, if this be done, that the district will continue with its project of sending water across the respondents' lands through the excavated channel of North Slough.

At the outset we have to consider the nature of the

injunctive order as to its being mandatory or prohibitive, for it is well settled that: "If the injunction is mandatory in character, it is automatically stayed by the appeal, and upon a mistaken attempt of the trial court to enforce it, the appellant is entitled as a matter of right to issuance of the writ of supersedeas. ▇ If on the other hand the injunction is prohibitory, it is self-executing and its operation is not stayed by the appeal." (*Food & Grocery Bureau* v. *Garfield*, 18 Cal.2d 174, 176-177 [114 P.2d 579].) However, "The question of whether a decree is of the one character or the other is sometimes a difficult one, as an order which is entirely negative or prohibitory in form may prove upon analysis to be mandatory and affirmative in essence and effect . . ." (*Food & Grocery Bureau* v. *Garfield, supra,* at p. 177, citing *Schwarz* v. *Superior Court*, 111 Cal. 106 [43 P. 580], *Ohaver* v. *Fenech,* 206 Cal. 118 [273 P. 555], *Feinberg* v. *One Doe Co.,* 14 Cal.2d 24 [92 P.2d 640], and *Byington* v. *Superior Court,* 14 Cal.2d 68 [92 P.2d 896].)

Discussing now the question of what sort of injunction we have in the case before us, we find a line of cases which we think decisive.

. In *Clute* v. *Superior Court,* 155 Cal. 15 [99 P. 362, 132 Ann.St.Rep. 54], there was presented the following set of facts: A corporation running a hotel sued out a temporary injunction against the defendant who claimed to be the treasurer of the corporation and the manager of the hotel. By the decree he was ordered to cease collecting money or disbursing the same, to cease representing himself as manager and treasurer and to cease interfering with, directing or attempting to direct, or controlling, the employees of the corporation. ▇ Said the Supreme Court: "It is thoroughly settled that, while an injunction which merely has the effect of preserving the subject of the litigation in status quo is not suspended by an appeal, . . . a mandatory injunction, i. e., one which compels affirmative action by the defendant, cannot be enforced pending a duly perfected appeal. . . . ▇ If an injunction, though couched in terms of prohibition, is mandatory in effect, a proceeding by the court issuing it to punish a violation as a contempt is in the nature of process for the enforcement of the affirmative feature of the writ. It may be likened to an execution, and, if the enforcement of the injunction has been stayed by an appeal, a writ of supersedeas may properly be issued by the appellate court to arrest further action by the court below."

The court declared the decree before it to be mandatory. It reasoned that if Clute was in the actual possession of the hotel and the personal property in it an order punishing him for preventing another person from entering and taking charge could have no other effect than to compel him to turn over his possession to that other or at least to surrender his theretofore exclusive possession. Said the court: "Clute, claiming to hold on behalf of the corporation, was resisting a right of entry claimed by persons who, as he asserted, had no authority from the corporation to take possession. An order turning over the control of the property from him to the other claimants would certainly, if executed, operate to change that status. . . . For the purpose of determining the effect of this injunction as mandatory or prohibitory, we must consider the result of an enforcement of the writ on the position of the defendant, as asserted in the court below. If the injunction compels him affirmatively to surrender a position which he holds, and which, upon the facts alleged by him, he is entitled to hold, it is mandatory."

We next refer to *Joerger* v. *Mt. Shasta Power Corp.*, 214 Cal. 630 [7 P.2d 706]. There the plaintiff in the action was asserting a violation by the defendant of riparian rights in a stream, the waters of which it had diverted above plaintiff's land and carried to a point where the water was returned to the stream below plaintiff's land. The trial court had granted a preliminary injunction against defendant, restraining it from so interfering with the waters of the stream, and the defendant corporation appealed. Said the court on the nature of the injunction: "This brings us to the consideration of the vital phase of the present controversy, viz., the nature of the injunctive order. If it be mandatory in character it is conceded that it is automatically stayed by the appeal therefrom. . . . We are persuaded that the injunctive order issued herein has the essential characteristics of a mandatory injunction. The defendants are and always have been lawfully in possession of their property. In that possession they are engaging in a lawful use thereof. They are not trespassing upon any of the rights of the plaintiff. . . . The effect of the order, if enforced, would be to disturb a lawful use of property lawfully in possession, and to dispossess the defendants of the use of any of the waters of the stream." The court then declared that the decree was automatically stayed as a matter of law by the appeal.

We refer next to *Feinberg* v. *One Doe Co.*, 14 Cal.2d 24

[92 P.2d 640]. There a woman employee of a corporation had gotten into a dispute with her union which had a contract with the employer. Under that contract the corporation was not to employ anyone not in good standing with the union. That was the woman's status and the union obtained a preliminary injunction restraining the employer from employing her. It refused to heed the injunction after taking an appeal and the trial court punished its officers for contempt. In a review of that order the Supreme Court said it was satisfied the injunction was mandatory because, since the woman had the status of an employee at the time the injunction was pronounced, its inevitable effect was "as an order compelling affirmative action on the part of the defendants." Said the court further: "Inasmuch as Amelia Greenwood at the time of the issuance of the order was already in the employ of the defendants, and the very controversy arose out of the *continuance* in employment of said Amelia Greenwood, it is apparent that the result intended to be accomplished by the issuance of said order was the compulsory release of said Amelia Greenwood from employment by the defendants. In short, the order directed and commanded the defendants to discharge said employee."

We next refer to *Byington* v. *Superior Court,* 14 Cal.2d 68 [92 P.2d 896]. San Francisco had built two dams on the Hetch Hetchy. A lower riparian owner had sought to quiet title to certain riparian rights and asked injunctive relief to protect those rights. The trial court declared the extent of the rights of the city and enjoined it from storing water in excess of its storage rights as so declared. An appeal was taken and pending the appeal the city raised the height of one dam above what it had been, with the result that the total storage was increased by over 100,000 acre feet. The trial court proceeded to adjudge the public utilities commission of the city to be guilty of contempt. ■ Said the Supreme Court: "Whether an injunction is prohibitory or mandatory in character is not always easy of determination. What may appear to be negative or prohibitory frequently upon scrutiny proves to be affirmative and mandatory. The authorities indicate that an injunctive decree that compels the surrender of the lawful possession of real property amounts to the granting of affirmative relief and is mandatory in character. . . . The reasoning therein [referring to cited cases] compels the conclusion that the injunction involved herein was mandatory in character and stayed by the appeal

therefrom. Throughout the trial of the main action, and up to the present moment, the city has contended that in addition to the prescripive right recognized in and awarded to it under the decree of the respondent court, it was the owner and possessor of certain appropriative rights in and to the waters of the Tuolumne River. The effect of the injunctive decree was to compel the city to restrict its storage solely to the amount of water to which it was entitled under its prescriptive right and to subordinate certain of the city's appropriative claims to that of the plaintiff in the action and, in effect to deprive the city of the full possession and privilege of exercising such appropriative rights. . . . We are of the view, therefore, that in so far as the injunctive decree of the respondent court undertook to and did preclude the exercise by the city of its appropriative rights in and to the excess waters of the Tuolumne River it was affirmative or mandatory in character, within the meaning of the authorities, and was therefore automatically stayed by the appeal.''

Before applying the foregoing rules for determining the character of the injunctive decree before us, we return to the facts found by the trial court. It found that the appellant is a public corporation possessing the power of eminent domain and that for the purpose of the public use, of which it was in charge, it had, a number of years before respondents filed their action, entered upon their property, excavated the channel of North Slough and begun the service of water to consumers, which water it was storing behind Hogan Dam; that all it did was for the benefit of the persons within its boundaries entitled to its services; that the acts of which respondents complain had been going on continuously up to the time of trial and that whatever it had done upon respondents' property was done in the service of a public use. The court found further that its acts in entering upon respondents' property, in excavating the channel of North Slough, and in turning down the slough quantities of water through the greater part of each year, amounted to a taking. Just what was taken the court did not by its findings specifically describe, but it is apparent from the record that it could only have meant that through adapting the channel of North Slough to its purposes and uses for the transportation of water it had assumed an easement or right of way across respondents' lands for that purpose. This analysis is reinforced by those parts of the judgment describing with great particularity the location of the easement which, according to the trial court, the

respondents must purport, at least, to grant appellant if and when it pays to them the damages which the court finds has resulted from the acts of appellant. The court found that the total damage for taking and for severance was the sum for which it gave judgment. It appears from the record, therefore, that appellant was in actual possession and exercise of a claimed easement over respondents' property and that in this litigation it was steadily asserting ownership rights of an easement to convey water across respondents' lands. It was engaged steadily in the business of promoting the public use of which it was in charge through the delivery of such water in that manner. It is apparent from the record that if this injunction were enforced appellant would be compelled to give over the possession it is holding under claim of right, and to give up its status established for so many years. Thus it seems that by a decree couched in prohibitory language it is mandated to surrender all of that for which it is contending in the cause.

We conclude that this injunction is mandatory and is automatically stayed by the appeal. In theory therefore no supersedeas need be granted since the statutory supersedeas is operative. However, we think it appropriate that, to set the matter at rest, we should grant the writ asked for.

Let a writ of supersedeas issue.

Peek, J., and Schottky, J., concurred.