[Civ. No. 8788. Third Dist. Apr. 23, 1956.]

FRED PODESTA et al., Plaintiffs and Appellants, v. LIN-
DEN IRRIGATION DISTRICT, Respondent; THE
STOCKTON AND EAST SAN JOAQUIN WATER
CONSERVATION DISTRICT, Defendant and Ap-
pellant.

Jones, Lane, Weaver & Daley for Plaintiffs and Appellants.

Neumiller, Ditz, Beardslee & Sheppard, Neumiller, Ditz & Beardslee, Neumiller, Ditz, Beardslee & Diehl, Irving L. Neumiller, Robert N. Barbour and Joseph W. Diehl for Defendant and Appellant and for Respondent.

Wilson Biddick, Jr., City Attorney (Stockton), Harold W. Kennedy, County Counsel (Los Angeles), Lloyd S. Davis and Iver E. Skjeie, Deputy County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

VAN DYKE, P. J.—This action was brought by plaintiffs and respondents, Fred and Adeline Podesta, against two public agencies, one a water conservation district, the other an irrigation district. By their complaint, plaintiffs sought damages claimed to have been suffered by them as landowners when the two agencies took a part of their property for public use without having paid compensation therefor. A general statement of the case is to be found in *Podesta* v. *Linden Irr. Dist.*, 132 Cal.App.2d 250 [281 P.2d 905].

The trial court made the following findings of fact: In 1926, the plaintiffs purchased and since have been owners in fee of a parcel of real property referred to in the findings as parcel one, which lies south of the natural watercourse known as the North Slough of the Calaveras River. In 1931, the plaintiffs purchased and have since owned a second parcel lying to the north of said watercourse. In 1935, plaintiffs purchased and have since owned a third parcel, lying partly north and partly south of said slough, and contiguous to the first two parcels. Prior to 1860, North Slough carried a relatively large amount of the water of the Calaveras River. After the year 1860, the mouth of the slough slowly filled with sand as a result of natural processes. The filling of the mouth caused the flow in North Slough to diminish gradually until the greater portion of the water that had formerly entered it was caused to flow into another fork of the river known as Mormon Slough. Mormon Slough branches off from North Slough approximately one mile to the east and upstream from plaintiffs' land. Since about 1900, and until the diversions made by the defendants, North Slough carried only freshets or flood waters in the channel across plaintiffs' land and that only for about four days in any one year. These freshets and flood waters originated in the natural watershed of the Calaveras River. For the rest of the time of each year there was no water in North Slough. Plaintiffs' land is devoted to the

extensive culture and growth of fruit and row crops and comprises an area of 610.55 acres. At the height of the fruit-packing season, about 600 men are employed thereon. Except for short periods in the winter months, constant movement of men and equipment across the channel of North Slough is and was required to carry out plaintiffs' farming practices. There is no other reasonable means of access from the south to the land lying north of the channel of North Slough where extensive buildings are located. Prior to the year 1934, it was the custom and the practice of plaintiffs and of their predecessors in interest to use the dry bed of North Slough as a means of passage for horses, persons and farm equipment from one side of the channel to the other, except during the short periods when water was running therein. Three roadways across the bed of the channel were used for this purpose. The channel of North Slough runs one and one-half miles through and across plaintiffs' land. On December 7, 1933, the Linden Irrigation District, hereinafter called irrigation district, commenced work on a project to deepen the mouth and channel of North Slough for the purpose of diverting thereto the water then flowing in Mormon Slough. In order to accomplish this, the irrigation district deepened the mouth of North Slough 9.8 feet so that the elevation of the bottom of North Slough was identical with the elevation of the bottom of Mormon Slough at their point of juncture. The irrigation district also constructed a floodgate in the channel of North Slough about three-fourths of a mile upstream and to the east of plaintiffs' land. As a necessary part of its project, said defendant also entered the land of plaintiffs and excavated the channel of North Slough through said land. The extreme depth of the excavation on plaintiffs' land was 13 feet; the weighted average of the excavation as it existed and now exists along the channel across the land of plaintiffs was 4.9 feet. The excavation was completed about May 24, 1934. Some time in the winter of 1933 or the early months of 1934, plaintiffs, and their predecessors in interest in the parcel last acquired, orally and without consideration consented to the deepening of said channel and the increase of the natural flow therein, so long as the irrigation district built and maintained three bridges across the channel. During the year 1934, said defendant district constructed two bridges for plaintiffs and one bridge for plaintiffs' said predecessors in interest. These bridges were designated as Podesta Number 1, Podesta Number 2, and the Lewis Bridge. The Lewis Bridge is located on the land of plaintiffs

last acquired. From the year 1934 until the year 1936 the irrigation district diverted water for public use from Mormon Slough into North Slough and down the channel thereof through plaintiffs' land. The district maintained the three bridges from 1934 until 1936; but in the year 1936 it ceased operations and no longer diverted water through plaintiffs' land. From the year 1936 until the year 1949, the mouth of the channel of North Slough again filled up with sand due to natural processes, and the channel returned to its former intermittent flow when freshets or flood waters were carried about four days a year. Plaintiffs resumed their former practice of using the dry stream bed for passage across their land. In the year 1936, the irrigation district ceased to repair and maintain the bridges. Through the years ensuing after the year 1936, these bridges gradually became dilapidated. In 1948, defendant Stockton and East San Joaquin Water Conservation District, hereinafter called the appellant district, was formed. One of its purposes was the resumption of the project of the irrigation district. Appellant district leased the works and head gates of the irrigation district for a term of 10 years by a written lease agreement executed December 1, 1948. The lease provided that the appellant district assumed such "purely legal liability" as the irrigation district had to repair the three bridges located on plaintiffs' land. On or about January 1, 1949, the appellant district again deepened the mouth of North Slough and again excavated the channel through plaintiffs' land; and also at that time constructed a weir in Mormon Slough about one-half mile downstream from North Slough. The weir decreased the flow of water in Mormon Slough and increased the flow of water in North Slough. The weir, the head gates, the deepened mouth of North Slough and the deepened channel through plaintiffs' land were all integral parts of the same project to increase the flow in North Slough for public use, and the project would not otherwise be effective. The effect of the entire project since January 1, 1949, has been to cause water to flow from the main channel of the Calaveras River into North Slough for public use almost continuously throughout the year. Were it not for the completion and maintenance of said diversion project, all of said continuous flow in North Slough as it has existed since January 1, 1949, except for the intermittent freshets and flood flows hereinbefore referred to, would flow in Mormon Slough and not in North Slough. Since January 1, 1949, the appellant district has furnished irrigation water from North Slough

without cost to numerous landowners within its boundaries whose lands adjoin North Slough. Plaintiffs' lands are within said district. Plaintiffs, from time to time, have pumped an undetermined amount of water from North Slough. Although the three bridges depreciated and became dilapidated after they ceased to be maintained by the appellant district, they were still capable in some degree of safe use by plaintiffs until May 31, 1953. Since that date, the direct effect of said continuous flow of water through the excavated channel on plaintiffs' land has been to sever the land of the plaintiffs into two separate parcels.

On January 1, 1949, plaintiffs notified both defendant districts that the appellant district would obtain plaintiffs' permission to use said channel to conduct the flow of said increased water only upon the condition that said defendants would build and maintain said three bridges, and on the further condition that the agreement of appellant district to so maintain and repair be put in writing. The defendant districts, however, failed to repair or maintain the bridges after said notice and failed to make or execute any agreement in writing. On April 16, 1949, plaintiffs notified defendant districts that unless the three bridges were repaired and maintained, and unless the written agreement to repair and maintain was executed by appellant district, all permission to use said excavated channel through plaintiffs' land was revoked as of the first day of May, 1949. Both of said districts have failed to make any repairs on the three bridges, have failed to maintain them, and have failed to enter into any agreement so to do. The land of plaintiffs is now severed as aforesaid and has continued to be severed since on or about May 31, 1953. The value of the plaintiffs' land in an unsevered condition on May 1, 1949, and also at the date of trial was the sum of $840,000. Due to the severance, the value of their land on said dates was reduced in the amount of $77,000. To repair the severance, it is necessary to construct and maintain three bridges and thereby replace and restore the present dilapidated structures. The cost of the three bridges which includes first construction, replacement at the end of 20 years capitalized at 5 per cent, maintenance at 1 per cent per year and insurance, totals $77,364. The reasonable value of the use of said excavated channel and the severance of plaintiffs' land from the 31st day of May, 1953, to the date of trial is a sum equivalent to $77,000 at 7 per cent interest for said period.

From the foregoing findings of fact, the trial court drew the following conclusions: The channel of North Slough of the Calaveras River where it flows through the land of the plaintiffs is a natural watercourse, but since the year 1900, the natural flow of said channel has been limited to freshets and flood flows for about four days a year. The transaction between the irrigation district and the plaintiffs in 1933 and 1934, whereby the plaintiffs and plaintiffs' predecessors in interest granted permission to said defendant to excavate the channel and increase the flow of water through plaintiffs' land so long as the said defendant maintained three bridges across the channel, was not a bilateral contract binding upon the irrigation district to repair and maintain the bridges at all times. Since the irrigation district has not diverted water through said channel since the year 1936, it owes no duty and is under no liability to plaintiffs to repair and maintain said bridges. The appellant district has no right to sever the land of the plaintiffs by diverting water through the excavated channel of North Slough, and plaintiffs' consent for such diversion was terminated as to both defendant districts on May 1, 1949. The continued diversion by the appellant district since said first of May, 1949, and the severance of plaintiffs' land since May 31, 1953, constitutes a taking and damaging of private property for public use without just compensation having first been made to the owners. As a direct result of said continued diversion and the resulting severance, a detriment has been suffered by plaintiffs and a benefit conferred upon appellant district. Plaintiffs have not been guilty of laches and no applicable statute of limitations or prescriptive period has run so as to bar their right to bring this action. Any benefit that the plaintiffs may have received from pumping an undetermined amount of water introduced by said appellant district into North Slough was a general and not a special benefit and would not bar this action nor constitute an equitable defense against said plaintiffs. The damage to plaintiffs for the permanent severance of their lands by the intentional acts of appellant district is the sum of $77,000 with interest thereon at the legal rate of 7 per cent per annum from the 31st of May, 1953. On the payment of said sum and interest to plaintiffs, the appellant district is entitled to a grant of easement from plaintiffs, permitting it to divert said increased flow of water through the excavated channel on plaintiffs' land in perpetuity and without any liability for severance damages. Until the payment of said

sum with interest as provided, appellant district should be enjoined from introducing water into said North Slough of the Calaveras River in the channel through plaintiffs' land in excess of the natural flow of said channel as it has existed since the year 1900.

Judgment pursuant to the findings of fact and conclusions of law was entered, and it contained provisions as follows: That plaintiffs have judgment against the appellant district in the sum of $77,000 with interest thereon at the rate of 7 per cent per annum from May 31, 1953; that said sum must be paid to plaintiffs within 30 days after final judgment herein as the term "final judgment" is defined in California Code of Civil Procedure, section 1264.7; that if appellant district file an affidavit in the cause that its bonds must be issued and sold in order to provide the money necessary to pay any portion of said judgment, then such portion may be paid at any time within one year from the date of such final judgment, with the further provision that if the sale of any such bonds cannot be had by reason of litigation affecting the validity thereof, then the time during which such litigation is pending shall not be considered a part of the one year's time in which such payments must be made. Upon the payment of said sum, plaintiffs shall execute a grant of easement to appellant district, granting it the right to divert the increased flow of water through the excavated channel on plaintiffs' land in perpetuity, together with the right of reasonable ingress and egress to maintain and safeguard such channel, but the burden of the easement shall be limited to the capacity of the excavated channel as it now exists. Until the acquisition of the right-of-way through the channel by appellant district, it is enjoined from introducing water into North Slough in the excavated channel through plaintiffs' land in excess of the natural flow of said channel as it has existed since the year 1900, which natural flow consists of freshets or flood water flowing in said channel for four days a year. Appellant district is given 30 days after final judgment is rendered in the matter to file with the court its written election to abandon its project of increasing the flow of water through the excavated channel on the land of the plaintiffs and in the event said written election is so filed and said project is so abandoned within said period, the amount of damages awarded to plaintiffs against appellant district shall be reduced by a sum of money equal to interest on $77,000 from May 31, 1953 to the date of filing said election

at the rate of 7 per cent per annum for said period. In the event of the filing of such election, the injunction provided for shall remain in full force and effect. It was further adjudged that plaintiffs take nothing against the irrigation district.

The appellant district appeals from the judgment rendered against them and in favor of the irrigation district.

It was the basic theory of plaintiffs that the defendant districts in charge of public use and possessed with the power of eminent domain have taken property of plaintiffs for such public use without paying compensation therefor and that plaintiffs were, under article I, section 14, of the California Constitution, entitled to recover the damages they had suffered. While not denying that it has gone upon plaintiffs' land and has excavated the existing channel of North Slough therein, or that it is sending a large volume of water across the land, using the excavated channel as the conduit therefor, or that the preexisting condition of those lands with respect to the water flowing in said channel has been materially altered, and while not denying that it intends to continue such acts, the appellant district, nevertheless, for various reasons, insists that it has the right to do what it has done and is doing. It asserts that it is not liable to plaintiffs under said article and section of the Constitution because it has in fact neither taken nor damaged the private property of plaintiffs, or if there has been such a taking or damaging, that it resulted wholly from the lawful exercise of the police power; that it has done no more to or upon the land of plaintiffs than to inflict such injury as a private landowner down the stream below plaintiffs' land would have the right to inflict. In addition, appellant district claims the trial court committed reversible errors as follows: (1) Failing to find that plaintiffs' cause of action, if any, was barred by the statute of limitations and by laches; (2) that if not liable to plaintiffs as upon a basis of taking and damaging their property without compensation, the trial court could not assess liability upon it on any principle of unjust enrichment; (3) that the court erred in assessing damages without a finding on benefits which plaintiffs may have received by the flowing of water through their land and without a finding that plaintiffs had suffered damages therefrom, appellant district asserting that neither the one finding nor the other could be supported in the record had the same been made and that, therefore, plaintiffs made out no cause against it; (4) that the trial court erred in awarding severance damages to plain-

tiffs and also in rejecting evidence of special offsetting benefits if severance damages were to be awarded; (5) finally, it asserts in the field of reversible error the trial court applied the wrong measure of damages.

 Article I, section 14, of the Constitution reads in part: "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for the owner, . . ." Whenever private property has been taken or damaged for public use without compensation this section of the Constitution, which has been held to be self-executing, affords a basis for an action by the injured party to recover in a suit, often called a suit in inverse condemnation, the just compensation which ought to have been paid before the taking or damaging occurred (*Smith* v. *City of Los Angeles*, 66 Cal.App.2d 562, 573 [153 P.2d 69]; *Elliott* v. *County of Los Angeles*, 183 Cal. 472, 475 [191 P. 899].)

 The findings made by the trial court graphically picture the situation existing when the irrigation district, with the leave and license of plaintiffs, in 1934 excavated the upper reaches of the channel of North Slough from the point where it branched off the Calaveras River to and through plaintiffs' land. For more than 30 years that part of the channel of North Slough, while formerly carrying the greater burden of the water of the Calaveras River had almost completely ceased to receive any water therefrom. The trial court found that through that long period of time the only waters entering North Slough from the Calaveras River were occasional freshet waters when the river was at crest. This occurred an average of four times a year for a single day at a time. The mouth of the slough had been almost completely sealed off from the river by the deposit of silt and soil washed into the channel by the river. The head of the slough was nearly ten feet above the level of the river which from that point downstream was known as Mormon Slough. To be sure, the court found that notwithstanding this altered condition North Slough was a natural watercourse. Our attention is repeatedly directed to this finding by the appellant district, and upon that finding it lays great stress. The finding is of little moment in this case and its significance rests entirely in the detailed findings as to the condition of the channel and as to the paucity of stream flow entering the same from the river. Of course

it is a watercourse and the complete sealing of its mouth would not destroy its nature as a watercourse since it would still serve to drain surface waters and other accumulating ground waters, and the land through which it passed would be burdened by that servitude. (*Haun* v. *DeVaurs,* 97 Cal. App.2d 841, 843 [218 P.2d 996]; see also Wat. Code, § 1201; *Cederburg* v. *Dutra,* 3 Cal.App. 572, 575 [86 P. 838]; and *Smith* v. *City of Los Angeles, supra,* pp. 578-579.) ▮ But the burden of service owed by land through which there is a natural watercourse is largely determined, not by the fact that it is a natural watercourse, but by the factual conditions which measure the nature and the extent of the servitude. The trial court found that by slow and natural processes North Slough had been so filled with detritus that it had been for about 30 years all but completely sealed off from the parent river; that only occasionally would water flow from the river therein and then for negligible periods of time; that as this condition progressed, plaintiffs and others above and below them upon the stream had adapted their farming operations to the changing conditions of the stream and had for years passed freely over it at most points for most of the year, including all of that part of the year devoted to farming activities; that the ordinary farming operations encompassed the constant and free use of the dry channel as a part of integrated farming operations on all of plaintiffs' land. It is these findings which measure and fix the servitude of plaintiffs' land to the natural watercourse and not the mere fact that it still constituted a natural watercourse. When, therefore, the irrigation district in 1934, by leave and license of plaintiffs and not under claim of a right to do so, entered upon plaintiffs' land and made in the channel of North Slough the extensive excavations which the court found had been necessary to the utilization of the channel for the district's purpose, it did that which it could not rightfully have done except in one of two ways—either by condemning the necessary rights through plaintiffs' land along the channel or by exercising such rights under the leave and license of plaintiffs.

The irrigation district elected to take nothing from plaintiffs save in accordance with the contract between them. The district obtained, therefore, nothing more than a right to go upon the land, to make necessary excavations in the channel, and to flow water through plaintiffs' land so long as it fulfilled the conditions under which the right to do these things

was given it by the plaintiffs. The findings of the court show fully the conditions under which these continuing rights could be enjoyed. For so long as the rights were used the irrigation district was bound to maintain bridges across the channel in an agreed number with the evident purpose that such bridges would serve as a substitute for the dry channel crossings theretofore used by plaintiffs. As the court found, these limitations of the rights being exercised by the irrigation district were understood and observed by the district until after two years, the district abandoned its project of using the channel as a conduit for water from the river and, coincidentally with that abandonment, discontinued likewise the maintenance of the bridges. The trial court found that in so doing the district was acting within the fair meaning of its contract with plaintiffs, and this finding is borne out by the court's finding as to the terms of that contract. Upon that election, therefore, the irrigation district withdrew from the channel, and the natural processes which had for so long operated to seal the channel off from the river again resumed their way with the result that in the 14 years intervening between the time the irrigation district left the channel and the time when appellant district assumed its present control, the channel, including that part which ran through plaintiffs' land, again filled up. Plaintiffs resumed their previous use of the channel, crossing back and forth over the same freely in the economic operation of their farm. The irrigation district has never resumed any control over the channel nor attempted to do so. It did purport to lease to the appellant district the head gate which it had constructed in the channel east of plaintiffs' land, but even in that it was careful to protect itself from any claim that it was itself making any use of the channel and thereby bringing down upon itself the liability to maintain plaintiffs' bridges, which structures by that time were all but unusable. We think, therefore, that for all practical purposes North Slough had returned to the condition that existed before the irrigation district, with plaintiffs' leave and license had entered thereon, and that the burden of servitude imposed upon plaintiffs' land by the presence of the channel, if it had ever changed, had reverted to the condition existing before the entry of the irrigation district. Therefore, when the appellant district, without leave or license, entered the channel, excavated it from its mouth down to and through the land of plaintiffs and claimed and exercised the right to flow

through the land great quantities of water thus artificially introduced from the river, and exercised over the channel such secondary easements of control as were necessary to continue the use of the channel as a conduit, it did so wholly without right. These things it could not do, as the trial court found, without injuring, damaging and interfering with the very ownership, possession and use of plaintiffs' land. It is still exercising those rights and insists that it will continue to do so and, as the trial court found, is devoting the rights it has thus taken to a public use. We, therefore, have all the elements of a taking and damaging of private property for a public use without compensation paid. Upon the findings of the court, therefore, the appellant district has taken the property of plaintiffs for a public use without paying compensation therefor, and unless there be other defenses which will shield the district from liability, the court upon these findings was required to fix and to award to respondents damages adequate to compensate for their injuries.

The appellant district contends in support of its appeal herein that all that it did was done in the exercise of the police power. The contention cannot be sustained. The same argument was made in *Smith* v. *City of Los Angeles, supra,* page 576, where the claim was that dikes constructed by defendants which diverted the flow of a natural watercourse over onto respondents' lands to their damage had been constructed for flood control purposes under the police power and that any damage resulting was *damnum absque injuria*. Referring to the extended consideration of the question in *Archer* v. *City of Los Angeles,* 19 Cal.2d 19 [119 P.2d 1], and in *Rose* v. *State,* 19 Cal.2d 713 [123 P.2d 505], the court held that the contention was wholly without merit as there was no basis for the application of the police power doctrine to the factual situation shown there and in the cited cases. We make the same observation with respect to the case before us.

"Generally, it may be said that police power operates in the field of regulation, except possibly in some cases of emergency such as conflagration or flood when private property may be temporarily used or damaged or even destroyed to prevent loss of life or to protect the remaining property of an entire locality. There is obviously no element of regulation involved in the case at bar, and no suggestion of anything in the nature of an emergency. The damage to plaintiffs' property here involved was the result of a public

improvement constructed by the state in the exercise of its power of eminent domain.

". . . it should be obvious that the police power doctrine cannot be invoked in the taking or damaging of private property in the construction of a public improvement where no emergency exists. To hold otherwise would in effect destroy the protection guaranteed by our Constitution against the taking or damaging of private property for a public use without compensation." (*Rose* v. *State, supra,* p. 730.)

Here the appellant district has gone upon the land of plaintiffs, has exercised and is still exercising sovereignty over those lands, has used them and is still using them in a way which withdraws them to a large extent from the use and occupation of plaintiffs and claims that the rights it has seized are permanently held by it because of its devotion of those rights to a public use. This conduct bears not the slightest similarity to the proper exercise of the police power.

In view of the nature of the acts of the appellant district, the applicable statute of limitations is that found in the five-year limitation expressed in the Code of Civil Procedure. In 18 California Jurisprudence 2d 100 it is said that though in some cases it has been held the three-year limitation prescribed by section 338, subdivision 2, has been applied in inverse condemnation actions, nevertheless, there are cases "which distinguish between a mere trespass action and an action for damages because of the taking or damaging of private property under the power of eminent domain, and on this basis consider the 5-year period to be applicable." (*Martin* v. *Western States Gas & Elec. Co.,* 8 Cal.App.2d 226 [47 P.2d 522]; *Katenkamp* v. *Union Realty Co.,* 36 Cal. App.2d 602 [98 P.2d 239].) In *Martin* v. *Western States Gas & Elec. Co., supra,* which was an action to obtain an injunction in damages for the taking of water from a stream for public use in violation of plaintiff's riparian rights, the court said at page 230:

"We are of the opinion the court erred in holding that the plaintiff's damages for the appropriation of the increased quantity of water from the American River to the detriment of his riparian right thereto, was barred in three years thereafter under the provisions of subdivision 2 of section 338 of the Code of Civil Procedure. It is the established law of this state that the riparian rights of an owner of real property to the use and benefit thereof are an inherent part of the

land, and the appropriation of such water is therefore a detriment to the real property as distinguished from a mere trespass. [Citing cases.]

. . . . . . . . . . . . . . .

"It follows that the defendants' appropriation of the plaintiff's riparian right to water from the American River adjacent to his Riverton property constituted a taking and damaging of the real property contrary to the provisions of article I, section 14, of the Constitution of California, and the statutory limitation of time within which the owner thereof may recover damages therefor is not barred in three years, but the right of action for damages, under the circumstances of this case, does not expire short of the five years necessary for the defendants to have acquired title to the water by adverse possession. It may not be said the defendants' appropriation of the increased quantity of water was a mere trespass on the plaintiff's interest in the land."

The application of the foregoing rules to the situation presented here is obvious. This was no mere trespass. It was a taking in perpetuity. The action having been begun within three years and seven months after the commencement of the adverse use, it was brought in time and was not barred by the statute of limitations.

Appellant district contends that the trial court committed reversible error in awarding plaintiffs any relief in view of what they assert to have been plaintiffs' laches. The contention cannot be sustained. The trial court found that there had been no laches on the part of plaintiffs and this finding is supported by the evidence. Apparently plaintiffs, although advisedly maintaining at all times that what appellant district was doing and claiming the right to do to and through their lands was wrongful, were yet willing, in the exercise of good neighborliness, to grant leave or license therefor to the district upon the same conditions that such leave or license had been granted to the irrigation district. They promptly informed the district when it began its unlawful activities that it could not use the channel unless it complied with these conditions; that is, that it build and maintain substitute bridge crossings for plaintiffs' use and that it enter into a written agreement to maintain them. The appellant district claims that in reliance upon inactivity of plaintiffs, it entered into its contractual obligations with the irrigation district, constructed the weir across Mormon Slough in order to facilitate the pouring of the river waters through

the north channel, arranged for the use of the City of Stockton's Hogan Dam for storage purposes and did other acts and things, all with the purpose of using North Slough as a conduit through which to deliver river water to lands along North Slough. But the proof of these activities did no more than to create a conflict on the subject of laches with the proof made by plaintiffs of their consistent efforts to stop the contemplated seizure of their land by the district. The finding of the trial court that by what was done on both sides the district's defense of laches was not made out must stand on this appeal.

Appellant district contends that the trial court erred in its rulings upon proof of damage and in the measure of damages and in awarding any damages to plaintiffs. Perhaps it could be said that some things said during the trial about the measure of damages and the mode of ascertaining the same might have been said with greater precision, but it is apparent, nevertheless, that in substance and to all practical ends the award of damages made by the trial court is supported by the law and the evidence. Appellant district has wrongfully taken the rights with respect to and over plaintiffs' property which we have heretofore discussed and described. The physical effect of this was to cut the plaintiffs' land in two and it appears that plaintiffs' efforts to prove the damages thus inflicted upon them was directed and confined to proving the amount by which the theretofore existing value of their holdings had been reduced by what the district had done and was doing and would continue to do in the future. By what it had done and by the dedication of the rights it had taken to public use and its active exercise of those rights in that use, the district had taken and now owned such rights in perpetuity. By reason of the law of its creation, and so long as the public ought to be so served, it was required to continue the exercise of those rights and thereby to continue the delivery of water from the river to the lands along North Slough. Having seized the rights and set up the use, it needed no license, leave or conveyance from plaintiffs to the perfection of its ownership of those rights. Just compensation it was obliged now to pay. There was testimony, and as to this there was little if any conflict, that by what it had taken the district had diminished the value of plaintiffs' property in the amount of $77,000 and it was this sum that the trial court awarded in the judgment against the district.

 It was not until after the entry of that judgment that appellant district sought leave on motion for new trial to introduce testimony of expert land valuers contradicting the testimony of plaintiffs' expert witnesses. The trial court refused to reopen the case to receive such evidence, and it was acting within the limits of its discretion in so doing. Appellant district claimed that it had not pictured the action as being one in inverse condemnation and as, therefore, requiring proof of damages usual in such actions. The trial court's holding against this contention is supported by those parts of the record which show that the plaintiffs at least had openly tried their case upon the theory that it was an action in inverse condemnation.

 We find no error in the method adopted to determine damages. No proof was made of the value of the rights and easements taken, but of this omission appellant district cannot complain. The proof was confined to damage to the property not taken by reason of its severance from the part taken and the construction of the improvement. (Code Civ. Proc., §§ 1248-1252.) It was permissible to prove this element of damage by showing market value before and after, as was done. (*People* v. *Ricciardi*, 23 Cal.2d 390, 401 [144 P.2d 799].)

 There was no error in giving no consideration to benefits from construction of the improvements. (Code Civ. Proc., §§ 1248-1253.) The benefits referred to in the code are special benefits as contrasted to general benefits common to the community. Whether benefits are special or general in a given case is often a perplexing question. We think the trial court was here justified in refusing to offset benefits. "... general benefits consist in an increase in the value of land, common to the community generally, and resulting from advantages which will accrue to the community from the improvement. Special benefits, on the other hand, are such as result from the mere construction of the improvement, and are peculiar to the land in question." (*County of Los Angeles* v. *Marblehead Land Co.*, 95 Cal.App. 602, 614-615 [273 P. 131].) Here there was no special benefit peculiar to plaintiffs' land. At the time of trial there were 119 pumps within appellant district using water out of the various channels controlled by the district, and 61 of these were in North Slough. Also, for the service of water through that channel, a charge could be made upon all lands receiving water. If that were done, and if plaintiffs were presently

charged with the full value of the benefit, the result would be a double charge. This cannot be done. (*Oro Loma Sanitary Dist.* v. *Valley*, 86 Cal.App.2d 875 [195 P.2d 913]. See also *Prudential Ins. Co.* v. *Central Nebraska Public P. & Irr. Dist.*, 139 Neb. 114 [296 N.W. 752, 145 A.L.R. 1].)

Appellant district makes no other attacks on the judgment either as to form or substance.

 Plaintiffs have appealed from that part of the judgment which decrees that they take nothing from the irrigation district. The appeal is without merit. Plaintiffs contend the district, by leasing its head gates in North Slough to the irrigation district, so placed itself in privity therewith as to make itself equally liable. But the irrigation district has taken nothing from the plaintiffs. And it was not obliged to anticipate the irrigation district would put the leased head gates to wrongful use; it could assume the lessee would obey the law.

The judgment is affirmed.

Schottky, J., concurred.

PEEK, J.—I dissent. I cannot agree with that portion of the opinion which holds that although admitted by the parties, and as the trial court found, North Slough is a natural watercourse, nevertheless ''the burden of service owed by land through which there is a natural watercourse is largely determined, not by the fact that it is a natural watercourse, but by the factual conditions which measure the nature and the extent of the servitude.'' The facts and conditions, it is stated, which so measure the servitude in the present case, are as shown by the findings of the trial court that since 1936 when the irrigation district abandoned its project, North Slough, by slow and natural processes, has been so built up by debris as to be all but completely sealed off from the parent river; that water flowed in the slough only for negligible periods and only when the river was at flood stage; that respondents had adapted their farming operations to this changed condition in that they had been able to use the dry channel for the passage of farm machinery and livestock to the extent that the channel had become a part of the integrated farming operations of their land which consisted of three parcels purchased in 1926, 1931 and 1935 respectively; that the acts of defendants in entering upon plaintiffs' land, removing the debris at the mouth of the channel, leveling

it and diverting water therein were wholly without right and had the effect of severing plaintiffs' land into two parcels, and hence the trial court was required to award adequate damages to plaintiffs for their injuries.

At the outset the conclusion of the majority is met with the basic finding that North Slough is a natural watercourse. It did not lose its characteristics as such merely because water flowed therein only "infrequently in times of storm . . . It is sufficient if, during some seasons, water does in fact flow in the stream bed." (*Mogle* v. *Moore,* 16 Cal.2d 1 [104 P.2d 785].) And being a natural watercourse, defendants could properly use it as a conduit for conducting foreign waters (Wat. Code, § 7075; *City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68 [142 P.2d 289]; *Stevens* v. *Oakdale Irr. Dist.,* 13 Cal.2d 343, 352 [90 P.2d 58]) and augment its flow not to exceed the capacity of its channel. (*San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200].)

But, say the majority, the factual conditions found by the trial court "required" it to fix and award plaintiffs adequate damages for their injuries. But what were plaintiffs' injuries? The evidence, and it is not contended otherwise, only shows a use by the defendants of a natural watercourse as a conduit for conducting irrigation waters which obviously augmented the flow during summer months, but did not exceed its capacity. There is absolutely no evidence of direct injury to plaintiffs' land such as flooding or erosion by reason of defendants' use of the channel; hence the only damage which could have been suffered by plaintiffs was, and the court so found, that their lands were severed into two parcels thereby precluding them from using the channel for the free passage of their employees, their farm equipment and their livestock from the north side where extensive farm buildings were located to the south side of North Slough.

It would appear to me that the question so posed has been adequately answered in a series of four cases recently decided by this court.

The first was *Fell* v. *M. & T. Inc.,* 73 Cal.App.2d 692 [166 P.2d 642]. In that case as in the present, the stream was dry in summer but wet in winter. Because of defendants' draining of irrigation water therein during the summer months, plaintiffs' lands were flooded, foul growth was stimulated and it was impossible for plaintiffs to move farm machinery and livestock across the stream bed as before. The trial court

granted plaintiffs' injunction as prayed and perpetually enjoined defendants from allowing any irrigation waters to flow in said stream. Upon appeal the sole argument in support of the judgment was that since the watercourse had formerly been dry throughout the summer season, any water which would not flow therein during that time of year was foreign to its natural flow, hence it constituted damage *per se* to the defendants in their farming operations. In reversing the order of the trial court granting the injunctive relief sought, we said:

"The California Constitution, article XIV, section 3, declares that the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent possible. (Compare Water Code, §§ 100-107.) The mandates of this section 'apply to the use of all water, under whatever right the use may be enjoyed.' (*Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 367 [40 P.2d 486].) Since foreign waters may be produced for beneficial use (*Stevens* v. *Oakdale Irr. Dist.,* 13 Cal.2d 343, 352 [90 P.2d 58]), and a natural channel may be used as a conduit or drain for the flow of such waters (*City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68, 76-77 [142 P.2d 289]; *Stevens* v. *Oakdale Irr. Dist., supra*), and since the use of such foreign waters, as long as it does not interfere with the rights of another, is of no concern to such other (*Bloss* v. *Rahilly,* 16 Cal.2d 70, at pages 78-79 [104 P.2d 1049]), it follows that a noninjurious and reasonable use by defendants of the waters imported upon their lands and allowed to drain into Little Chico Creek is within the protection of the Constitution and may not be enjoined."

In their petition for hearing before the Supreme Court, plaintiffs stated, "If this is to be the law of the State of California, the decision should be affirmed by the Supreme Court, for it is a revolutionary application of the constitutional provision . . ." This is true, they said, because any interference with the rights of another may be enjoined, and to allow waters which would not naturally flow in the stream was a positive interference with such rights. However, the petition for hearing was denied.

Shortly thereafter we were presented with a second case, *Cheesman* v. *Odermott,* 113 Cal.App.2d 26 [247 P.2d 594]. There again, as in the instant case, plaintiffs, a lower owner, sought to enjoin defendants, upper owners, from discharging irrigation water into a natural watercourse which transversed

plaintiffs' property. The evidence showed that plaintiffs, in preparing their land for irrigation and farming, had destroyed the natural watercourse through their land. This court affirmed the trial court's denial of the injunctive relief sought by plaintiffs, and in preface to a restatement of the above quotation from the Fell case said, "Whatever the rule may be in other jurisdictions, we think that in California it has been modified to fit the necessities of a people who must depend greatly upon irrigation." (P. 28.) We further held that, since there was no evidence that the use made of the watercourse there in question was anything more than as a conduit to conduct water, such use, although making it impossible for plaintiffs to farm their land as previously, and as they desired to continue, the acts of defendants in so discharging irrigation water into a natural watercourse could not be enjoined. Again a petition for hearing in the Supreme Court was denied.

The third case was *Provident Irr. Dist.* v. *Cecil,* 126 Cal. App.2d 13 [271 P.2d 157]. There the defendants constructed a dike cutting off the flow of water through channels and drains on their land through which irrigation water was run by the plaintiff irrigation district, and thereafter leveled their land, filling such drains. In affirming the judgment of the trial court prohibiting such acts by the defendants, we said that since the channels were natural drains, plaintiffs "had the right to have them maintained in their natural state to carry off waters naturally flowing through them and also to discharge into them such reasonable quantities of excess waters as could be discharged and borne away without injury to defendants' land." (Citing *Fell* v. *M. & T. Inc., supra.*) No petition for hearing was filed in the Supreme Court.

In the fourth case of this series, *Phillips* v. *Burke,* 133 Cal. App.2d 700 [284 P.2d 809], the defendants as in the Cheesman and Provident cases, in leveling their land for irrigation and farming, had obliterated the natural watercourses through their land. It was defendants' testimony that because of the irrigation runoff during the summer months, it was impossible to farm the land as before and in effect such waters had so divided the land that they were compelled to farm it as though it were three separate parcels. Upon appeal it was contended that winter flow was no measure of reasonable and noninjurious use and that their farming operations would ". . . be seriously impaired by the maintenance of ditches across their land the year around." In affirming the judg-

ment of the trial court on the particular phase of that case which is the same as the question at issue in the instant case, this court said:

"The answer to this would seem to lie in the plain meaning and logic of the Fell and Cheesman decisions. The right to discharge surplus irrigation waters would of necessity be used primarily during the summer months, there being little if any need to irrigate during the winter season. If the right exists, it must also be for use during the summer months. Thus to argue, as defendants do, that for the use to be reasonable and noninjurious it must be limited to use outside of the summer irrigating season, is but to wholly deny the right."

Although, as it appears to me, the identical question was involved in each of the cited cases, we found in favor of the party using the natural channel across the lower owner's land for the flowage of irrigation waters, even to the extent of dividing it into three parcels as in the Phillips case, and even though it was contended in the Phillips case that "the Fell and Cheesman decisions are not sound." But again in the Phillips case, as on each previous occasion, the Supreme Court denied a hearing.

Hence it would seem to follow (1) that if, under the constitutional provision, the applicable code section and the cases cited and discussed, a natural watercourse may be used as a conduit to conduct irrigation waters, and (2) if, as our courts have held, a natural watercourse retains its characteristics whether water flows therein continually or sporadically, and (3) if the flowage of water in a watercourse during the dry season, in the absence of a showing of unreasonable or injurious use, cannot be enjoined even though it divides another's land making it impossible for him to freely cross what was formerly a dry bed of the channel in carrying on his farming activities, then the judgment of the trial court herein, which is directly contrary thereto, should be reversed.

A petition for a rehearing was denied May 16, 1956. Peek, J., was of the opinion that the petition should be granted. Defendant and appellant's petition for a hearing by the Supreme Court was denied June 20, 1956.