308 P.2d 254

**VANTEX LAND AND DEVELOPMENT
COMPANY, Inc., a corporation,
Appellant,**

v.

**Jack M. SCHNEPF and Maude Schnepf,
Appellees.**

**No. 6044.**

Supreme Court of Arizona.

March 12, 1957.

Herbert Mallamo, Phoenix, for appellant Leslie Parry, Phoenix, of counsel.

Snell & Wilmer, Phoenix, for appellees.

WINDES, Justice.

This case involves the respective rights of Vantex Land and Development Company, Inc., plaintiff-appellant, and Jack M. Schnepf and Maude Schnepf, defendants-appellees, to the use of certain waste water. The facts either undisputed or such as could be found by the trial court are that defendants and plaintiff own adjoining tracts of land, plaintiff's lands lying to the south and west of defendants. Adjoining defendants on the south and southeast is land owned and farmed by one Boyd Lisonbee and adjoining Lisonbee on the south is land owned and farmed by Lawrence Ellsworth. All these lands and other surrounding lands have been reclaimed for agricultural purposes and irrigated by the pumping of underground waters. Prior to reclamation there passed diagonally across these lands in a northwesterly direction a dry wash known as Sonoqui Wash into which drained surface water created by excess rain. Subsequent farming activities somewhat obliterated the wash as such and the respective owners, generally following the channel of the old wash, bulldozed a drain ditch to care for the drainage of these waters. This drain ditch meandered in a northwesterly direction from Ellsworth's land across Lisonbee's and defendants' holding to plaintiff's land. The irrigation operations of Lisonbee and Ellsworth result in a certain amount of waste or "tail" water which they permit to drain into the drain ditch and flow upon defendants' land. There was evidence to the effect that Lisonbee and Ellsworth had an understanding with defendants that defendants would permit them to drain their excess waste water on their land provided they could use the same. Some of plaintiff's own waste water also drained off of plaintiff's land over defendants' land and into the drain ditch. On April 12, 1954, the state land commissioner, pursuant to plaintiff's application, issued to the plaintiff a permit to appropriate the water of Sonoqui Wash. Where the drain ditch enters defendants' land, they constructed a dam, culvert, headgate and sump thereby intercepting the flow of this waste water, impounding the same and using it for irrigation. Plaintiff seeks to enjoin defendants from intercepting and stopping the flow of this water.

Plaintiff filed a complaint asking that the defendants be enjoined from impounding, diverting or interfering with the free flow of this water. A temporary restraining order was issued together with an order that defendants show cause why a temporary or permanent injunction should not issue. After hearing wherein the foregoing facts were established, the court expressed the view that plaintiff was not entitled to an injunction and dissolved the

temporary restraining order. Plaintiff appeals.

The question presented for decision is whether the defendants are legally obliged to allow these waste waters to pass through their land without interruption for the use and benefit of plaintiff. We are not here concerned with the obligation, if any, not to intercept the drainage of natural surface waters. Plaintiff's position is that the waters drain into a natural channel crossing defendants' land, thereby becoming subject to appropriation, and that plaintiff was entitled to an easement across defendants' land for the transportation thereof. It is likewise claimed by plaintiff that defendants by their conduct are estopped to deny plaintiff this easement.

■ As to surface water, the general rule is that whatever servitude, if any, with which the lower land is burdened in favor of the higher land is limited to such water as naturally flows and the owner of the dominant estate may not artificially increase this burden to the detriment of the owner of the lower estate. 56 Am.Jur., Waters, section 71, page 555. Applying this rule to the defendants, aside from permission by reason of arrangements with Lisonbee and Ellsworth, the latter would have no right to artificially create the equivalent of surface waters and drain them upon defendants' land and interfere with defendants' farming operations. Defendants would have a right to protect their property therefrom by stopping the flow unless prevented by the fact that the drain ditch into which the waters were conducted upon defendants' land generally follows the contour of Sonoqui Wash and the fact that plaintiff had a permit to appropriate the waters of the wash. The fact that at one time prior to the irrigation of these lands there existed a wash, dry except for the intermittent accommodation of natural surface waters, and the fact that the existing drain ditch might serve the same purpose do not increase the burden of the servitude placed by law upon defendants' land and thereby require the defendants to receive waste water from the dominant estate. Anderson v. Drake, 24 S.D. 216, 123 N.W. 673, 27 L.R.A.,N.S., 250; Podesta v. Linden Irrigation District, 141 Cal.App.2d 38, 296 P.2d 401.

Defendant Jack M. Schnepf testified in effect that he was not intercepting natural surface water and that he intended to fill in the drain ditch in his farming operations by putting into cultivation an additional 20 to 30 acres. The trial court could well have decided that to require defendants to permit the passage of this waste water across their farm would substantially interfere with their farming operations to their detriment.

■ The defendants are not obliged to leave this drainage wash in its natural state in order to furnish the upper owners a drain ditch to carry their surplus waters.

The law imposes no such servitude upon the lower landowner. The extent of defendants' obligation is limited by the extent of the servitude imposed by law and not by that imposed through artificial farming operations on the dominant estate. If defendants can utilize the wash without violating any obligation imposed by the limitation of the servitude the law recognizes, there is no reason why they should not be allowed to do so.

There is much interesting discussion in the briefs concerning the question whether the plaintiff can under our statutes appropriate this waste water. We think this question is immaterial to a disposition of the case and we do not pass upon it.

■ Since the defendants are not obligated to receive this artificially-developed water, the fact that plaintiff received a permit to appropriate the same does not impose upon defendants the obligation to permit its transportation across their land to enable plaintiff to complete its appropriation by putting it to beneficial use. Easements or rights of way for conducting water across another's land are not created merely by a permit to appropriate. If plaintiff has a valid permit to appropriate this waste water, it must find some other means of conducting it than by means of a gratuitous easement over defendants' property. That defendants stopped the water when it entered their property and are utilizing the same is of no concern of plaintiff since defendants are not obligated to deliver it to plaintiff.

To enjoin the defendants from stopping this water would encumber their property with the burden of a servitude the law does not authorize. Nothing herein should be considered as announcing any principles that might have a bearing upon the rights concerning the flow of natural surface waters, nor is there any question herein of any rights that may be acquired by prescription.

■ Plaintiff contends that under the evidence the defendants by their conduct are now estopped to intercept this water for the reason that they permitted plaintiff to expend monies in the construction of installations for its capture and utilization. The evidence is not sufficient to estop defendants from denying plaintiff's right to an easement over their land. In order for the plaintiff to invoke an equitable estoppel, it must clearly show that there was reliance upon the conduct and conversations of the defendants. 19 Am. Jur., Estoppel, section 83, page 730. There was evidence of two purported conversations between Virgil J. Vance, president of plaintiff corporation, and defendant Jack M. Schnepf wherein Schnepf was supposed to have indicated he would not hold the water. There was evidence likewise that defendants did not protest the granting of plaintiff's permit to appropriate. The con-

versations were after plaintiff had commenced the construction of its works and could not well be considered as having been an inducing cause of plaintiff's acts. The defendants were not obliged to protest plaintiff's application for a permit to appropriate merely because plaintiff might have thought such permit, if allowed, would give an easement over defendants' land. The plain fact is that plaintiff's complaint refutes the idea there was any reliance upon defendants' conduct. Plaintiff expressly alleges that it constructed its works "in reliance upon the aforesaid application and permit granted". The trial court clearly was not required to rule that defendants were estopped by their conduct.

The judgment is affirmed.

UDALL, C. J., and PHELPS and LA PRADE, JJ., concur.

STRUCKMEYER, Justice (dissenting).

I am unable to agree with the disposition of this case. The problem presented here arises out of conditions peculiar to the desert regions of the western part of this country and is a matter of first impression in this state. It is my conclusion that the majority have adopted and applied a rule of law which is not adapted to the natural and physical conditions of the people of this state and one which in this specific instance achieves an extremely harsh and oppressive result. I am compelled to these conclusions by consideration of facts which in part are undisclosed in the majority opinion and, therefore, a further statement of the matters which are pertinent to a complete decision is necessary.

Farming developed around Sonoqui Wash in the 1940's being carried on by the pumping of water from underground sources applied by irrigation to the surface. There, as is true everywhere in irrigation, surplus water wastes off the land to which it is applied. This is inevitable because the water must flow across the surface of the soil for a sufficient length of time to penetrate to the depth of the plant root system. In years past, the waste water from farming emptied into Sonoqui Wash, and with the possible exception of one year, passed down the channel, where it dissipated in the sand and gravel of the desert.

It should be immediately understood and emphasized that Sonoqui Wash is a desert wash similar to Coyote Wash except as to size. Coyote Wash was held by this court to be a natural watercourse, Southern Pac. Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81. It should be further understood that the area in and about Sonoqui Wash has been designated as "critical" by the State Land Commissioner so that the drilling of irrigation wells to reclaim other desert lands is now forbidden by law, Southwest Engineering Co. v. Ernst, 79 Ariz. 403, 291 P.2d 764; consequently, while there are many thousands of acres of desert land

suitable to irrigation in this region, there is no underground source of supply of water available for that purpose.

In the spring of the year 1953, the plaintiff applied for and obtained a permit to appropriate 1,280 acre-feet of water out of Sonoqui Wash. This was under the appropriate statutes of which Section 45–101, subd. A, A.R.S.1956 is in part a rescript:

"The waters of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, *waste* or surplus water, and of lakes, ponds and springs on the surface, *belong to the public* and are subject to appropriation and beneficial use as provided in this chapter." (Italics ours.)

By this section all waters found flowing in natural channels belong to the public and may be appropriated. No distinction is made between natural and artificially produced water; the only condition to appropriation is that it be found in a natural channel. The public purpose of this statute is, of course, apparent. In the desert no commodity has greater value than water. To the end that the ultimate beneficial use may be made of such a valuable substance and to encourage its use and re-use, the legislature has provided that the water, the subject matter of this litigation, may be validly appropriated, and when so appropriated, it is, of course, protected to the same extent as other appropriations.

The following testimony of the President of appellant Vantek Company is uncontradicted:

"Q. What did you do to capture these waters, what improvements did you put there on the land to make use of the water? A. First we took a dozer and made a lake that probably covers five acres, then we have an underground pipeline that goes 1643 feet, a 24-inch pipeline that is built on a kind of decline, that goes into a well that is 38 feet deep and then we have another installation there with a motor and a pump that pumps the water out of this 30-foot well.

\* \* \* \* \* \*

"Q. What happens to it after it gets there? A. We have 75 horse-power motor that pumps this water 2700 feet up to the top of the 320 that we irrigate with it, and it goes into a concrete ditch.

\* \* \* \* \* \*

"Q. What other improvements do you have? A. We have a mile of concrete ditch.

"Q. Does the water discharge itself into the concrete ditch? A. That's right.

\* \* \* \* \* \* .

"Q. What do you approximate was spent in developing this water out of Sonoqui Wash? A. Well, approximately on the pump and the pipeline, I would say around $30,000.

* * * * * *

"A. Well, the cement ditch cost approximately $5,000 a mile and $50 an acre, which would be $16,000, roughly, to put the land in cultivation.

"Q. What would the total expenditure be that was spent in developing and using—making beneficial use of the water out of Sonoqui Wash? A. I would say approximately 42 to $43,-000.

"Q. Does that include—A. No, it would be around $50,000 on everything, that is including clearing of the land, the ditch, the sump and the lake. We had considerable trouble here in getting the right engineer to get this to pump, I guess it took us 30 days.

* * * * * *

"Q. What would you say the total value of the crop was grown on the south half of Section 34 last year? A. It would exceed $100,000."

It is plain that appellant, in compliance with the laws of this state, made a valid appropriation of water from Sonoqui Wash by putting it to beneficial use on 320 acres of land at a cost of about $50,000. He thus

became vested with a property right of which he could not be deprived without just compensation.

"We agree with plaintiffs that in water-right law in the arid west 'first in time is first in right.' We also agree that such right, when perfected, is a vested right and may not be taken from its owner except by his consent." Adams v. Salt River Valley Water Users' Ass'n, 53 Ariz. 374, 89 P.2d 1060, 1066.

The very next year appellee Schnepf, undoubtedly seeing the result of the appellant's ingenuity and industry, stopped the flow of water down Sonoqui Wash, diverted it, and applied it to use on his own land. Accordingly, it must be recognized that basically and fundamentally this lawsuit is a conflict over a supply of water sufficient to grow crops on a half-section of land; and that the majority decision permits the appellee to take that which the law has specifically designated as belonging to appellant.

This harsh and oppressive result is justified because of a supposed detriment suffered by Schnepf. The opinion states:

"Defendant Jack M. Schnepf testified in effect that he was not intercepting natural surface water and that he intended to fill in the drain ditch in his farming operations by putting into cultivation an additional 20 to 30 acres.

The trial court could well have decided that to require defendants to permit the passage of this waste water across their farm would substantially interfere with their farming operations to their detriment."

Since this claimed detriment is the only plausible reason assigned to justify the deprivation of the appellant of his water right, the precise record on this point bears examination.

Appellee, along with others in order to protect their farmlands adjacent to Sonoqui Wash, widened and deepened the channel, constructing a ditch so as to contain the flood waters that intermittently swept down in times of heavy rains. Schnepf testified:

"Q. You followed the places, though, that the water ran in the past? A. Yes.

"Q. Now, how deep is your ditch as it runs through your land? A. Well, at some points it is probably four feet, four and a half.

"Q. How wide is it? A. Well, the channel that we made itself is probably 30 feet, something like that."

It is now the appellee's claim that this ditch, which incidentally was put in just two years before Vantek made its appropriation, is the cause of the claimed detriment. He further testified:

"Q. Do you intend, as you testified, if you are not awarded the waters in Sonoqui Wash, do you intend to cover up that wash?

\*   \*   \*   \*   \*   \*

"(Objection by counsel, overruled by the court.)

"A. Yes, I intend to do away with this wash, this ditch that we installed.

"Q. Do I understand, unless this restraining order was issued you would have done away with that drainage and that passage prior to this time? A. In the course of time, I do not think prior to this time, but in the course of time I probably would have. It involves 20 or 30 acres of the best land I have on the farm and it is quite an expensive project to have it there for running waste water."

Now, it is my opinion that courts and the members thereof are not required to emasculate from their judicial decisions the power of critical analyses. The claimed detriment amounts to no more than this: By appellee's own Exhibit 8, this ditch which was excavated to supplement the natural channel of Sonoqui Wash runs through Schnepf's land a distance of not more than three-quarters of a mile. Three-quarters of a mile is 3,960 feet; 3,960 feet, when multiplied by the width of the artificial channel, gives the total area of the channel as 118,800 square feet; and this,

when divided by the number of square feet in an acre (43,560), gives a figure somewhat less than 3 acres, not 20 to 30 acres. *If Schnepf actually intends to fill in the ditch which he so recently excavated for the purpose of controlling flood waters, then by simply leaving a smaller ditch 3 feet wide sufficient to allow the passage of these waste waters, his supposed loss would be confined to about one-third of an acre.* This, when contrasted with Vantek's loss of 360 acres of land, together with capital investment, emphasizes that the purported detriment suffered by Schnepf is so inconsequential, incidental and unreal that the court should recognize and treat it for exactly what it is: A cloak behind which the appellee seeks to hide the commission of an immoral and unconscionable wrong. The foregoing discussion emphasizes that the sole issue ,in this lawsuit is the right of Vantek under the doctrine of prior appropriation to have this water come to it without interference or molestation.

On that issue the law is everywhere settled in appellant's favor and has been settled in this jurisdiction almost from the time the first settler drove the first wagon into the Territory:

"Here, the defendants, six or seven years subsequent to the appropriation of plaintiffs, bought the lands about two miles above plaintiffs, on both sides of the San Pedro river, and sought the usufruct of the waters thereof;

diverting the same by means of a dam, ditch, etc., thereby interfering with the vested rights of plaintiffs as prior appropriators. Plaintiffs, as prior appropriators, had acquired vested rights in these waters, and the purchase and ownership of the lands on both sides of San Pedro river above plaintiffs did not divest these rights." Hill v. Lenormand, 2 Ariz. 354, 16 P. 266, 268.

The doctrine of prior appropriation is essentially the right to take water from the appropriator's point of diversion without interference or molestation by an upper riparian owner. The decision here nullifies the statute and the clear legislative intent that artificially developed waters which have passed beyond the control of the developer are public and to be treated as public water subject to control and regulation by public authority because it denies to appellant the protection of the courts of this state for the enforcement of the right granted.

In lieu of enforcing the doctrine of prior appropriation, the majority have adopted the following principle as governing:

"As to surface water, the general rule is that whatever servitude, if any, with which the lower land is burdened in favor of the higher land is limited to such water as naturally flows and the owner of the dominant estate may not artificially increase this burden to the

detriment of the owner of the lower estate."

and cite 56 Am.Jur., Waters, Section 71 in support thereof. I am further critical of the application of this principle to the instant case for the following reasons:

*First,* while the rule announced perhaps is not unsound as an abstract rule of law, it should be remembered that where as here it is not practical to carry on farming operations without wasting water, a rule more compatible with the physical conditions in arid regions should be adopted. The wasting of irrigation water should be permitted if done without negligence and the resulting damage, if any, should be damnum absque injuria, for each riparian owner, including the appellee Schnepf, benefits by having the same right as against his lower riparian neighbor.

*Second.* Section 71 and the cases cited in support thereof deal solely and exclusively with surface water. Surface water is defined in the same work as:

"The term 'surface water' is used in the law of waters in reference to a distinct form or class of water which is generally defined as that which is derived from falling rain or melting snow, or which rises to the surface in springs, and is diffused over the surface of the ground, while it remains in such diffused state or condition." 56 Am. Jur., Waters, Section 65.

This is substantially the same definition adopted by this court:

" * * * waters falling upon and naturally spreading over lands. They may come from seasonal rains, melting snows, swamps or springs, or from all of them. Surface waters consist of surface drainage falling on or flowing from and over a tract or tracts of land *before* such waters have found their way into a natural watercourse." Southern Pac. Co. v. Proebstel, supra [61 Ariz. 412, 150 P.2d 83]. (Italics ours.)

Categorically surface waters are limited by both definitions to waters occurring naturally and do not embrace waters artificially placed on land. If the principle of law stated in Section 71 is to be extended to include artificially developed waters, then the majority should recognize that the text does not purport to encompass the present situation and, accordingly, is neither authority nor precedent for the decision.

*Third,* the general rule cited by the majority from Section 71 is contrary to the express rule repeatedly followed and relied on by this court to settle disputes in water and rights to the use of land, Roosevelt Irrigation District v. Beardsley Land & Investment Co., 36 Ariz. 65, 282 P. 937; City of Globe v. Moreno, 23 Ariz. 124, 202 P. 230, 27 A.L.R. 965; City of Tucson v. Dunseath, 15 Ariz. 355, 139 P. 177; Kroe-

ger v. Twin Buttes R. Co., 14 Ariz. 269, 127 P. 735, Ann.Cas.1914A, 1289.

"In a broad sense and as a general proposition there is no dominant and servient estate as applied to surface or rain waters.

"The doctrine of the respective rights of adjoining owners of realty has been many times before the courts, and, as applied and administered under what is known as the so-called common-law rule, is fairly comprehended and limited by the following quotations.

" 'One is under no obligation to receive from the other the flow of any surface water, * * *.' " City of Tucson v. Dunseath, supra [15 Ariz. 355, 139 P. 178].

Later this court meticulously re-examined the distinguishing lines of authority:

"There are two distinct doctrines relating to such water—the rule of the civil and that of the common law. The courts of many of the states have adopted the former, and where this is true the lower premises are subservient to the higher, the latter having a qualified easement in the former which carries with it the right to discharge all surface water thereon. The common-law doctrine, upon the other hand, has been accepted by the courts of a number of the states, and where it prevails the lower owes no duty to the higher estate relative to surface water, because it is regarded as a common enemy against which anyone may defend, * * *." Roosevelt Irrigation District v. Beardsley Land & Investment Co., supra [36 Ariz. 65, 282 P. 938].

It seems to me that it is hardly appropriate and certainly confusing to now cite with approval to a text embodying a rule so often and vigorously disapproved in this jurisdiction.

*Fourth,* the majority in adopting the principle set forth in Section 71 have here applied it where even the compilers of American Jurisprudence recognize that it has no application. The last sentence of Section 71 clearly points out that the principle therein stated has no application where surface water drains into natural watercourses:

"The acceleration or increase in volume of a natural watercourse or drainway by the drainage thereinto of surface water is discussed in subsequent sections.[15] " 56 Am.Jur., Section 71, Waters, 557.

Note 15 specifically directs attention to Section 73:

"*Drainage into or through Natural Watercourse or Drainway.*—It is well established as a general rule subject to certain modification hereinafter noted, that the owner of lands through or along the border of which a natural

watercourse flows may accumulate surface water falling upon lands adjacent thereto, and cast the same into such stream, without liability to a lower riparian owner for damages, although the flow of the waters is thereby accelerated and the volume increased, provided that this is done in the reasonable use of his own land." 56 Am.Jur., Waters, Section 73.

On this precise point the Supreme Court of California was readily able to find a distinction. In San Gabriel Valley Country Club v. Los Angeles County, 182 Cal. 392, 188 P. 554, 556, 9 A.L.R. 1200, it stated:

"But the present case is not concerned with surface waters, and the foregoing decisions are not in point. The waters upon which the drains here in question act have lost their character as surface waters before they reach the drains and have already been gathered into a definite body flowing as a stream in a water course. The difference between surface waters and those collected and flowing in a water course is well recognized, and the same rules by no means apply to one as to the other."

and in summarizing the distinction, stated further:

"Mr. Freeman in his note in 85 Am. St.Rep. 727, reviews very thoroughly the authorities dealing with the right to accelerate or diminish the flow of water, and upon the particular point under discussion says (page 733):

" 'We have just noticed the difference between merely draining onto another's land, and draining into a natural channel or water course, which flows across such land. So far as streams or natural water courses are concerned, there can be no doubt that one may drain into them, and thereby increase their volume without subjecting himself to liability for any damage suffered by a lower owner.' "

If this court is determined to include artificially produced waste water in the category of surface water, then as pointed out, since we are here dealing with a natural watercourse, Section 73 controls rather than Section 71.

*Fifth*, it hardly seems necessary to point out that in this jurisdiction courts are at liberty to adopt principles of law compatible with justice and suitable to the welfare of the people of the state:

"The common law *only so far* as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people * * * is adopted * * *." (Italics ours.) Section 1–201 A.R.S.1956.

The concept that the physical conditions and necessities of the people will govern the law applicable to the use of water has been consistently applied from the earliest deci-

sions to the present time. Chandler v. Austin, 4 Ariz. 346, 42 P. 483; Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., 39 Ariz. 65, 4 P.2d 369; Bristor v. Cheatham, 75 Ariz. 227, 255 P.2d 173; 73 Ariz. 228, 240 P.2d 185.

The problem presented here has been squarely met in the State of California in a case directly on point. The principle announced in Section 71 was expressly repudiated and the rule adopted that waste waters could be discharged into natural watercourses. In Cheesman v. Odermott, 113 Cal.App.2d 26, 247 P.2d 594, the plaintiffs, lower land owners, "sought to enjoin defendants from discharging irrigation waters into a natural water course which traverses the lands of plaintiffs." The California Court of Appeals said:

"Appellants take the position that the waters which respondents are causing to flow across the lands of appellants are waters which are artificially obtained and that therefore respondents should be enjoined from discharging the same into the stream in such quantities as to result in this water flowing across the lands of appellants. They quote from 27 Ruling Case Law 1151, section 79, a statement that under both civil and common law while water which naturally flows across land may continue to do so without subjecting the upper owner to any liability, yet the servitude which the owner of higher adjoining land has upon lower land for the discharge of *surface water* naturally flowing on the lower land from the dominant estate, extends only to surface water arising from natural causes such as rain and snow and cannot be augmented or made more burdensome by the acts or industry of man."

[It is to be noted that Section 79 of 27 Ruling Case Law 1151 is correlated to Section 71 of 56 American Jurisprudence 555.]

"Whatever the rule may be in other jurisdictions, we think that in California it has been modified to fit the necessities of a people who must depend greatly on irrigation. * * * And 'The right to use a natural channel as a temporary conduit or as a drain for artificial flow has been frequently upheld.' * * * 'Since foreign waters may be produced for beneficial use * * *, and a natural channel may be used as a conduit or drain for the flow of such waters * * *, and since the use of such foreign waters, as long as it does not interfere with the rights of another, is of no concern to such other * * *, it follows that a noninjurious and reasonable use by defendants of the waters imported upon their lands and allowed to drain into Little Chico Creek is within the protection of the Constitution and may not be enjoined.' Fell v. M. & T., Inc., 73 Cal.App.2d 692,

694–695, 166 P.2d 642, 643. We think it is now too late in this State to say that waste waters cannot be discharged into natural water courses." 113 Cal. App.2d 26, 247 P.2d 595.

There is nothing difficult about the case now before the court. This being a matter of first impression, we are at liberty to do that which is reasonable, just and fair. Where the innate fitness of the justice dispensed fairly discloses that justice has miscarried, the signposts of an erroneous decision are plainly marked. I can only conclude that this cause should be reversed with directions that the trial court forthwith enjoin the appellees from further interfering with the water flowing down Sonoqui Wash.