212 P.3d 1

**SOUTH WEST SAND & GRAVEL, INC., an Arizona corporation, Plaintiff/Appellant,**

v.

**CENTRAL ARIZONA WATER CONSER- VATION DISTRICT, an Arizona munici- pal corporation, Defendant/Appellee.**

**No. 1 CA–CV 07–0435.**

Court of Appeals of Arizona, Division 1, Department D.

Nov. 10, 2008.

As Amended March 9, 2009.

310

Lewis and Roca LLP By Robert F. Roos, Lawrence A. Kasten, Robert G. Schaffer, Phoenix, Attorneys for Plaintiff/Appellant South West Sand & Gravel, Inc.

Ryley Carlock & Applewhite By John C. Lemaster, Jenny J. Pelton, Sean T. Hood, Phoenix, Attorneys for Defendant/Appellee Central Arizona Water Conservation District.

Salmon, Lewis & Weldon, P.L.C. By M. Byron Lewis, Mark A. McGinnis, Phoenix,

Attorneys for Amicus Curiae Salt River Project Agricultural Improvement and Power District.

W. Patrick Schiffer, Chief Counsel, Arizona Department of Water Resources By Gregg A. Houtz, Deputy Counsel, Phoenix, Attorneys for Amicus Curiae Arizona Department of Water Resources.

Stephen M. Kemp, Acting City Attorney, Peoria City Attorney's Office By Cynthia Odom, Assistant City Attorney, Peoria, Attorneys for Amicus Curiae City of Peoria.

Sacks Tierney P.A. By Marvin S. Cohen, Scottsdale, Attorneys for Amicus Curiae City of Tucson.

Gallagher & Kennedy, P.A. By Mark A. Fuller, Phoenix, Attorneys for Amici Curiae Arizona Rock Products Association and Arizona Mining Association.

## OPINION

THOMPSON, Judge.

¶1 South West Sand & Gravel, Inc. (South West) appeals from a grant of summary judgment on its taking and tort claims against the Central Arizona Water Conservation District (the District). Based on our decision in *West Maricopa Combine, Inc. v. Arizona Department of Water Resources*, 200 Ariz. 400, 26 P.3d 1171 (App.2001), Arizona Revised Statutes (A.R.S.) section 45–173 (1994), and Arizona's historic encouragement of the full use of scarce water resources in our arid climate, we affirm the grant of summary judgment.

### FACTUAL AND PROCEDURAL HISTORY

¶2 The District manages the Central Arizona Project (CAP) and promotes water conservation in an area encompassing Maricopa, Pima, and Pinal Counties. Pursuant to A.R.S. § 45–891.01(3) (1994), the Arizona Legislature has authorized the District to operate taxpayer-funded underground storage facilities (USFs), also known as "state demonstration projects," to store CAP water when there is no immediate demand for it.

¶3 The District applied to the Arizona Department of Water Resources (ADWR) for permits to operate the Agua Fria Recharge Project (the Project), a state demonstration project within a four-mile reach of the Agua Fria River south of the New Waddell Dam. The Project consists of: (1) a managed underground storage facility, from which water is diverted from the CAP canal into the Agua Fria River's channel so it may infiltrate the aquifer underlying the river; and (2) a constructed underground facility, where water is conveyed downstream as surface flow after the aquifer becomes saturated. Both facilities are located near the Agua Fria River's natural channel. South West owns properties near the Project. Its South Property is located in the bed of the Agua Fria River, and its North Property is on the river's west bank, at an elevation higher than the streambed.

¶4 The Department issued the permits to the District on May 4, 1999, authorizing the District to store 100,000 acre-feet of water each year for twenty years in the Project. The permits authorize the District to conduct recharge into the Agua Fria River but also require the District to observe operational limits that maintain groundwater levels below the depth of South West's sand and gravel pits as they existed when the permits were issued.

¶5 Pursuant to the permits, the District began diverting CAP water into the Agua Fria River in 1999. As a result, the aquifer underneath and adjacent to the Agua Fria River filled with water, thereby raising the water table beneath South West's property to a level that interfered with its sand and gravel mining business.

¶6 It is undisputed that the groundwater reaches South West's property through a natural hydrologic connection between the surface of the riverbed and the underlying aquifer. Prior to the construction of the Waddell Dam in the 1920s, the water levels in the aquifer beneath and adjacent to the Agua Fria River would have been at or near the surface. In conducting recharge into the river, the District has raised water levels in the river's aquifer, but the District contends that those levels remain below what they

would have been under the river's natural flow.

¶ 7 South West sued the District in Maricopa County Superior Court, alleging negligence, negligence *per se*, trespass, nuisance, and inverse condemnation. South West moved for partial summary judgment, and the District moved for summary judgment on the North and South Properties. The trial court granted the District's motion and denied South West's motion as to the South Property. Because the record was not clear as to whether the water table beneath the North Property had risen to a level exceeding the aquifer's natural capacity, the trial court denied both summary judgment motions as to the North Property.

¶ 8 South West filed a motion for reconsideration/clarification. The trial court then granted summary judgment to the District for the North Property as well based upon the record and concessions made in the motion for reconsideration. This appeal followed.

## DISCUSSION

### A. As a Matter of Law, South West Has No Cognizable Taking Claim

¶ 9 On appeal from a grant of summary judgment, we determine *de novo* whether any genuine issues of material fact exist and whether the trial court correctly applied the substantive law to those facts. *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 140, ¶ 26, 128 P.3d 756, 763 (App. 2006). Summary judgment is warranted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). Our review of the trial court's construction of the relevant statutes, a determination of law, is *de novo*. *Ariz. Dep't of Revenue v. Blue Line Distrib., Inc.*, 202 Ariz. 266, 266, ¶ 4, 43 P.3d 214, 214 (App.2002).

¶ 10 Arizona law has historically recognized that the owner of stored waters has the right to use a natural stream to move and store water. Rev. Stat. of Ariz. Terr. §§ 4202–03 (1901). The intention of our early statutes was "to make the use of water, as much so as practicable, within the reach of all, and to guard it against monopoly by private ownership on the one hand, and against being hemmed in by the ownership of the adjacent land, liable to be acquired and held by speculators, on the other hand." *Oury v. Goodwin*, 3 Ariz. 255, 275–76, 26 P. 376, 383 (1891).

¶ 11 In 1986, the Arizona Legislature adopted a comprehensive water storage and recovery program. *W. Maricopa Combine*, 200 Ariz. at 405, ¶ 22, 26 P.3d at 1176 (citing Sec. 14, Chap. 289, Laws of 1986). Providing for water storage in Arizona's natural watercourses supports the twin policies of preserving groundwater and utilizing Colorado River water. *Id.* (citing A.R.S. §§ 45–801, –895 (1994), 45–1701, –1722 (1994)). The water at issue in this case comes from the CAP. We have recognized that the CAP "is indispensable for the maintenance of life and prosperity" in Arizona. *Taft v. Ball, Ball & Brosamer, Inc.*, 169 Ariz. 173, 175, 818 P.2d 158, 160 (App.1991) (citation omitted).

¶ 12 While Arizona was developing its statutes and policies on water storage, it decided to deviate from the riparian law of water rights enacted in most states. The Arizona Constitution repudiates the concept of riparian water rights and follows the law of prior appropriation. *See* Ariz. Const. art. 17, § 1. In Arizona, like California and Nevada, "'the right to running water exists without private ownership of the soil....'" *Hill v. Lenormand*, 2 Ariz. 354, 357, 16 P. 266, 268 (1888) (quotation omitted). Thus, "when a person acquires land he takes it subject to any water rights which might have been initiated according to the law." *England v. Hing*, 8 Ariz.App. 374, 378, 446 P.2d 480, 484 (1968), *vacated on other grounds*, 105 Ariz. 65, 459 P.2d 498 (1969).

¶ 13 The Arizona Legislature recognizes a right to locate an underground storage facility (USF) in a natural stream:

Although the waters which naturally flow in the natural channel of a stream have been previously appropriated and put to

beneficial use by others, the channel may be used to carry water of another or used for the location of an underground storage facility pursuant to chapter 3.1 of this title, if such use can be made without diminishing the quantity of water which naturally flows therein the use of which has been appropriated.

A.R.S. § 45–173(A). Nevertheless, South West contends that the District's use of an Arizona riverbed to transport and store water may give the owner of the riverbed and adjacent land a cause of action for a governmental taking and trespass.[1]

■■■ ¶ 14 Our main goal in construing this statute is to "discern and give effect to legislative intent." *People's Choice TV Corp. v. City of Tucson*, 202 Ariz. 401, 403, ¶ 7, 46 P.3d 412, 414 (2002). We "construe the statute as a whole, and consider its context, language, subject matter, historical background, effects and consequences, and its spirit and purpose." *Id.* (citations omitted).

¶ 15 In *West Maricopa Combine*, we concluded that A.R.S. § 45–173(A) allows a party to use another's real property to run water down the naturally existing Hassayampa riverbed. 200 Ariz. at 402–04, ¶¶ 1–15, 26 P.3d at 1173–75. Like South West, the landowner contended that the proposed action constituted a governmental taking and a trespass. *Id.* at 409–10, ¶¶ 42–47, 26 P.3d at 1180–81. We held that the plain language of A.R.S. § 45–173(A) contemplates that private property may be used to carry "water of another or used for the location of an underground storage facility." *Id.* at 405, ¶ 18, 26 P.3d at 1176.

¶ 16 We also held that allowance of West Maricopa Combine's use of another's real property to transport water did not constitute a taking. *Id.* at 409, ¶¶ 42–45, 26 P.3d at 1180. As we pointed out, any taking inquiry must first resolve whether the private party ever possessed the right that assertedly has been taken. *Id.* at ¶ 44 (citing

Douglas L. Grant, *Western Water Rights and the Public Trust Doctrine: Some Realism About the Takings Issue*, 27 Ariz. St. L.J. 423, 427 (1995)). We concluded that no taking had occurred because "the permitting process does not alter the pre-existing rights of the parties":

> Section 45–173 does more than simply codify the rights of water users in the natural channel that delivers their appropriation. By allowing "the location of an underground storage facility," the statute expressly authorizes a new use of an existing channel by the introduction of water originating in another water system.

> . . .

> 10K's title to the land adjacent to the Hassayampa River was taken subject to existing water rights. Specifically, 10K took its title subject to the inherent limitations arising from the state's reservation of the natural channels to move and store water. No taking can arise by this pre-existing limitation and this result is entirely harmonious with A.R.S. § 45–814.01(H).

*Id.* at ¶¶ 42–45; *accord Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (holding that a state may refuse compensation "if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with."); *In re Water Use Permit Applications*, 94 Hawai'i 97, 9 P.3d 409, 493–95 (2000) (concluding that no property interest existed and denying a takings claim based upon groundwater restrictions). Under this analysis, South West took its property subject to Arizona's reservation of natural channels to move and store water. The District was using that channel for the intended statutory purpose. No taking can arise from such activity.

---

1. The Fifth Amendment to the United States Constitution states in relevant part: "[N]or shall private property be taken for public use, without just compensation." The Due Process Clause of the Fourteenth Amendment applies the Takings Clause to the states. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 122, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Similarly, Article 2, Section 17, of the Arizona Constitution provides in relevant part: "No private property shall be taken or damaged for public or private use without just compensation having first been made...." South West's appeal relies upon both the state and federal constitutions.

### B. As a Matter of Law, South West Can Assert No Cognizable Tort Claims Against the District

¶ 17 *West Maricopa Combine* also precludes South West's trespass claim, as well as the negligence, negligence *per se,* and nuisance claims. We found that "[t]respass may only be found here if 10K has the right to exclude others from using the Hassayampa, and it does not have such a right.... A claim for trespass would not lie under these facts because 10K was obliged to receive WMC's water." *W. Maricopa Combine,* 200 Ariz. at 410, ¶ 47, 26 P.3d at 1181; *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 13, at 67 (5th ed. 1984).

¶ 18 Section 45–173(A) allows the use of the Agua Fria River channel for "the location of an underground storage facility." The District's Project is located within the stream channel, and South West's sand and gravel properties are located in and along that channel. The statutory authority to locate a USF in a stream channel logically must include the authority to put water in that facility, as that is the entire purpose of a USF. Likewise, South West is obliged to accept the water the District placed in the Agua Fria River. *See W. Maricopa Combine,* 200 Ariz. at 410, ¶ 47, 26 P.3d at 1181. South West had no historical right to exclude others from using the channel, and a claim for trespass or other wrongful injury cannot lie under these facts. *See id.*

¶ 19 South West and amici Rock Products Association and Arizona Mining Association attempt to distinguish *West Maricopa Combine* on the ground that the case involved no economic injury. *West Maricopa Combine* holds that because a landowner's title is subject to pre-existing limitations arising from the state's reservation of natural watercourses, landowners whose properties border a natural watercourse cannot maintain an action for trespass or a taking arising out of those activities. *See id.* at 409–10, ¶¶ 42–47, 26 P.3d at 1180–81. Whether the right is "economic" or not, our holding makes clear that suit cannot be maintained on a right that never vested in the property owner to begin with.[2]

¶ 20 This result is bolstered by the Colorado Supreme Court's decision in *Board of County Commissioners of County of Park v. Park County Sportsmen's Ranch, LLP,* 45 P.3d 693 (Colo.2002). Like Arizona, Colorado authorizes USFs and provides for entities to use stream channels for these facilities. In *Park County,* landowners brought a declaratory judgment action seeking a determination that the defendant ranch had no right to artificially recharge and store water in aquifers underlying their land without the landowners' permission. *Id.* at 700, 703. The Colorado Supreme Court held that the ranch had no obligation to seek the landowners' permission or to pay just compensation because a recharge does not constitute a trespass. *Id.* at 706–07. The same logic applies here. *See also Chance v. BP Chems., Inc.,* 77 Ohio St.3d 17, 670 N.E.2d 985, 992–94 (1996) (rejecting a trespass claim based upon absolute ownership of water and migration of liquid injected into the aquifer).[3]

### C. As a Matter of Law, the Doctrine of Non–Injurious Use is Inapplicable

¶ 21 South West and amici further contend that *West Maricopa Combine* is not controlling here because the "doctrine of non-injurious use" limits the District's right to transport and store water under A.R.S. § 45–173(A). We disagree.

---

2. For this reason *West Maricopa Combine* is distinguishable from *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). In *Causby,* the airspace at issue was not "within the navigable airspace which Congress placed within the public domain" and the landowners could therefore maintain a takings claim because the government had infringed on their right to exclude. *Id.* at 264, 66 S.Ct. 1062. Here, Arizona reserved the natural channels to store water, and South West does not possess the right to exclude recharge water from the Agua Fria River.

3. These arguments are also dispositive of South West's inverse condemnation claim. South West asserted this claim with respect to the North Property only. South West cannot prevail on the claim because it has not established a taking. *See Niles Sand & Gravel Co. v. Alameda County Water Dist.,* 37 Cal.App.3d 924, 112 Cal.Rptr. 846, 854 (1974).

¶ 22 In support of the non-injurious use argument, South West and amici cite *Vantex Land & Development Co. v. Schnepf,* 82 Ariz. 54, 308 P.2d 254 (1957), and *Podesta v. Linden Irrigation District,* 141 Cal.App.2d 38, 296 P.2d 401 (1956). Their reliance on these authorities is misplaced. *Vantex* concerned a bulldozed drainage ditch used to carry waste water from two non-parties' agricultural properties across the defendants' property and onto the plaintiff's property. 82 Ariz. at 55, 308 P.2d at 255. The defendants dammed the ditch so that they could impound the waste water and use it for irrigation. *Id.* The plaintiff intended to appropriate the waste water and sought to enjoin the defendants from intercepting it. *Id.* The issue was "whether the defendants are legally obliged to allow these waste waters to pass through their land without interruption for the use and benefit of plaintiff." *Id.* at 56, 308 P.2d at 256. The Arizona Supreme Court decided that "[t]o enjoin the defendants from stopping this water would encumber their property with the burden of a servitude the law does not authorize." *Id.* at 57, 308 P.2d at 257.

¶ 23 *Vantex* relied on *Podesta* in holding that the burden of the servitude placed upon land does not include the obligation "to receive waste water from the dominant estate." *Id.* at 56, 308 P.2d at 256 (citing *Podesta,* 296 P.2d 401). It occurred in the context of the artificial introduction of water into a historically dry natural watercourse. *Id.* at 55, 308 P.2d at 255. In contrast to this case, *Vantex* involved the discharge or appropriation of irrigation waste water, not the transportation and storage of surface water in a river. *Id.* As *West Maricopa Combine* explains, the principles that apply in the limited context of two competing water users are inappropriate in a case involving the use of a river channel to transport and store CAP water. 200 Ariz. at 406, ¶¶ 25–26, 26 P.3d at 1177.

**D. As a Matter of Law, the State's Reservation of Waters for Transportation and Storage is Not Limited to Natural Water Flow**

¶ 24 *West Maricopa Combine* also disposes of South West's argument that the state's reservation of its natural channels is limited to natural water flow. We previously concluded that this argument did not comport with A.R.S. § 45–173, which "indicates a *specific* contemplation of the addition of water that is not 'natural' to the waterway," or with Arizona's policy of maximizing beneficial use of a scarce resource. *W. Maricopa Combine,* 200 Ariz. at 406–07, ¶¶ 28, 29, 26 P.3d at 1177–78 (emphasis added) (citing *Pima Farms Co. v. Proctor,* 30 Ariz. 96, 102, 245 P. 369, 371 (1926)). This court declined to recognize any legal distinction between CAP water introduced for water recharge and the river's natural flow. *Id.* at 406, 407, ¶ 29, 26 P.3d at 1177, 1178 ("[T]his court previously found that the CAP … 'brings with it the benefits and burdens of a natural watercourse.'") (quoting *Taft,* 169 Ariz. at 176, 818 P.2d at 161).

¶ 25 South West nevertheless maintains that the state's reservation of the use of natural channels is limited to naturally occurring surface waters or flood waters. Under long-standing law, the owner of real property adjoining a natural watercourse may not assert a claim for damages arising out of the mere use of that watercourse to move and store water. *See S. Pac. Co. v. Proebstel,* 61 Ariz. 412, 420–24, 150 P.2d 81, 84–86 (1944) (holding that the defendant capturing water on its property and draining it into a natural watercourse without exceeding the channel's natural capacity could not be held liable for damages caused to a neighboring landowner's property where the water reached the plaintiff's land via a natural watercourse and was not conducted or discharged there). Landowners whose property adjoins a natural watercourse assume the burden of the location they have chosen. *See Ramada Inns, Inc. v. Salt River Valley Water Users' Ass'n,* 111 Ariz. 65, 67–68, 523 P.2d 496, 498–99 (1974) (concluding that the Arizona Canal should be treated as a natural watercourse and landowners could not recover damages for negligence, trespass, inverse condemnation, and strict liability claims stemming from the choice of location near the Arizona Canal); *Beals v. State,* 150 Ariz. 27, 31, 721 P.2d 1154, 1158 (App.1986) (holding that those who acquire property near a natural watercourse assume the burden of

any loss their choice of location occasions and cannot recover damages from the state for any non-negligent refusal to remove natural vegetation from the river).[4]

¶ 26 As we explained in *West Maricopa Combine*, we cannot reconcile the concept that the permitted use of a natural channel for moving and storing water is limited to natural water flow with existing Arizona statutes and common law. Thus, a property owner "may not prevent a beneficial user from using an existing natural watercourse for water storage purposes." *W. Maricopa Combine*, 200 Ariz. at 406, ¶ 24, 26 P.3d at 1177. Generally speaking, the property owner also is not entitled to have the water table beneath its land maintained at a static level. *See Brady v. Abbott Labs.*, 433 F.3d 679, 682–83 (9th Cir.2005) (applying Arizona groundwater law to hold that a pecan orchard owner could not maintain common-law nuisance and negligence claims arising out of groundwater pumping by a neighbor); *Bristor v. Cheatham*, 75 Ariz. 227, 237–38, 255 P.2d 173, 179–80 (1953) (holding that a landowner may withdraw and use as much groundwater from the common supply as is necessary for the reasonable beneficial use of the overlying land without regard to the rights of adjoining landowners).[5]

¶ 27 *West Maricopa Combine* likewise rejected South West's argument that A.R.S. § 45–814.01(H) preserves the right to exclude water entering beneath property via a natural watercourse. According to this statute:

> Nothing in this article shall be construed as modifying or infringing on any existing water rights or private property rights nor

shall anything in this article prevent any person or entity, whether governmental or private, from undertaking any flood control projects, including removal of vegetation within the channel of the stream or on the adjacent floodplain or diverting the permitted flow from the natural stream channel at the end of the permitted period.

A.R.S. § 45–814.01(H) (1995). We explained that real property ownership is distinct from ownership of water, below or above ground. *W. Maricopa Combine*, 200 Ariz. at 408, ¶¶ 37–38, 26 P.3d at 1179. Arizona has abrogated the riparian rights doctrine, and allows stream waters to be appropriated for use or to remain in the stream without regard to the rights of landowners bordering the stream. *See* John D. Leshy & James Belanger, *Arizona Law Where Ground and Surface Water Meet*, 20 Ariz. St. L.J. 657, 706–07 (1988). South West has no private property rights allowing it to exclude others for purposes of trespass or to support a taking.

**E. As a Matter of Law, A.R.S. § 45–811.01 Does Not Support South West's Claim for Unreasonable Harm**

¶ 28 Having concluded that *West Maricopa Combine* disposes of South West's taking and tort claims, we now turn to South West's remaining arguments. South West contends that the District has a statutory duty to determine that a USF will not cause unreasonable harm, and that the benefits of that duty extend to other landowners and continue beyond the permit stage. According to A.R.S. § 45–811.01(C)(3) (1994):

> The [Arizona Department of Water Resources] director may issue a permit to

---

4. Equally unavailing is South West's attempt to fit its tort claim into a line of cases supporting the recovery of damages from the obstruction of a natural water course. *See, e.g., Gillespie Land & Irr. Co. v. Gonzalez*, 93 Ariz. 152, 165, 379 P.2d 135, 145 (1963) (landowner may not divert the natural waters of a stream in a manner that floods his neighbor's land). The record reflects that water reaches South West's property via a natural hydrological connection between the underlying aquifer and the river's surface. There was no genuine dispute that the recharge has not raised water tables above the natural carrying capacity with respect to the South Property.

5. South West's authorities on this point are distinguishable. Two address liability for the negli-

gent operation of dams and other flood control structures. *See Natural Soda Prods. Co. v. City of Los Angeles*, 23 Cal.2d 193, 143 P.2d 12, 15 (1943); *Kunz v. Utah Power & Light Co.*, 526 F.2d 500, 503–04 (9th Cir.1975). Another case concerned a state's assertion of ownership of property between the high and low water marks of Lake Tahoe, *California v. Superior Ct. of Placer County*, 29 Cal.3d 240, 172 Cal.Rptr. 713, 625 P.2d 256, 257–58 (1981), and yet another involved the application of strict liability to a government flood-control project. *Akins v. California*, 61 Cal.App.4th 1, 71 Cal.Rptr.2d 314, 317, 325 (1998).

operate an underground storage facility if the director determines that all of the following apply:

3. Storage at the facility will not cause unreasonable harm to land or other water users within the maximum area of impact of the maximum amount of water that could be in storage at any one time at the underground storage facility over the duration of the permit.

¶ 29 The other four prerequisites for the permit are: (1) the applicant has the technical and financial ability to construct and operate the facility; (2) storage of the maximum amount of water that could be in storage is hydrologically feasible; (3) the applicant has agreed in writing to obtain any necessary flood plain permits; and (4) the Arizona Department of Environmental Quality has determined that the facility will not cause the migration of plumes of contaminants. *Id.* The statute is one provision of the Underground Water Storage, Savings and Replenishment Act, A.R.S. §§ 45–801.01 to –898.01.

¶ 30 On its face, A.R.S. § 45–811.01(C)(3) applies only to the ADWR's decision to issue a permit. Nothing in A.R.S. § 45–811.01(C)(3) imposes a continuing and independent obligation on the owner or operator of the USF or on the ADWR.[6] The statute does not address enforcement of the conditions of a permit, once issued. The statute concerns only the prerequisites to issuance of the permit. Nowhere in A.R.S. § 45–811.01(C)(3) did the Arizona Legislature create a continuing cause of action against the owner or operator of a USF.

 ¶ 31 More importantly, the ADWR has consistently interpreted the "no unreasonable harm" requirement in A.R.S. § 45–811.01 in a manner inconsistent with South West's proffered interpretation. ADWR construes that prerequisite to apply only to harm to a use taking place at the depth of a sand and gravel pit as it existed at the time the permit was applied for and issued. *See* ADWR's Substantive Policy

Statement on Unreasonable Harm and Hydrologic Feasibility (Dec. 10, 2002) at 9 (ADWR Policy Statement) (limiting consideration of unreasonable harm only to "existing and ongoing uses of land . . . ."). We accord great weight to an agency's interpretation of the statutes it is entrusted to administer. *See Ariz. Water Co. v. Ariz. Dep't of Water Res.*, 208 Ariz. 147, 154, ¶ 30, 91 P.3d 990, 997 (2004) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer") (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *Phelps Dodge Corp. v. Ariz. Dep't of Water Res.*, 211 Ariz. 146, 152–53, ¶ 25, 118 P.3d 1110, 1116–17 (App.2005).

¶ 32 The ADWR Policy Statement acknowledges that the Arizona Legislature has accorded so much importance to underground water storage that it allows some harm to third parties to further the advancement of that goal; a permit may be denied only if the harm to others is unreasonable. ADWR Policy Statement at 1. The agency director (the Director) conditions underground storage permits on the establishment of alert levels and operational prohibition levels that would not allow stored water to enter existing sand and gravel pits. While harm to a pit as it existed when the permit issued would be unreasonable, ADWR does not consider harm that may occur if the pit is expanded after the permit is issued. This interpretation is consistent with A.R.S. §§ 45–814.01(D) and (G), which provide that the Director shall consider unreasonable harm only to uses existing at the time the permit issued when deciding whether to grant an application for renewal or modification of a USF permit.

¶ 33 The contrary interpretation advocated by South West and amici, which would require ADWR to consider the depth a sand and gravel operation might reach sometime in the future, could unduly prevent persons with excess Colorado River water and ef-

---

6. Another statute, A.R.S. § 45–814.01(F), not cited by appellant, does authorize the Director to "require the holder of a storage facility permit to monitor the operation of the facility and the

impact of water storage at the facility on land and other water users within the area of impact of water stored at the storage facility."

fluent from storing that water underground when it was available. In the ADWR's view, it would be inconsistent with legislative policy to allow mine operators to reserve empty aquifer space below their land for possible future mining activities by denying underground storage of available excess renewable water supplies. Little underground storage would occur if agencies and courts permitted sand and gravel entities to derail permit applications, prevent recharge and freeze the underground water table at artificially deep levels resulting from prior stream diversions, dams, and groundwater withdrawals. The state would be left with increasingly lowered groundwater levels. In contrast, determining unreasonable harm based upon uses existing at the time of permitting would encourage use of Arizona's underground aquifers for storage of excess Colorado River water and effluent.

### F. As a Matter of Law, the District is Not Liable for Raising Underground Water Levels

¶ 34 Equally unavailing are the arguments South West derives from the doctrine of *"cujus est solum ejus est usque ad coelum et ad inferos"* (the "cujus doctrine"). The doctrine states: "To whomsoever the soil belongs, he owns also to the sky and to the depths. The owner of a piece of land owns everything above and below it to an indefinite extent." Black's Law Dictionary 341 (5th ed.1979). In essence, South West argues that its ownership of overlying land gives it the power to preclude water recharge and increased groundwater levels while claiming damages for trespass, nuisance, and other claims based upon such activities.

¶ 35 Time after time, Arizona courts have held that landowners do not own the groundwater below their property and the state is free to regulate its withdrawal and use. In *Town of Chino Valley v. City of Prescott*, the Arizona Supreme Court stated: "We therefore hold that there is no right of ownership of groundwater in Arizona prior to its capture and withdrawal from the common supply and that the right of the owner of the overlying land is simply to the usufruct[7] of the water." 131 Ariz. 78, 82, 638 P.2d 1324, 1328 (1981), *appeal dismissed*, 457 U.S. 1101, 102 S.Ct. 2897, 73 L.Ed.2d 1310 (1982).

¶ 36 In this case, the Director determined that the District's storage would not cause unreasonable harm to South West. He made this determination in an administrative proceeding subject to appeal under Title 41, Chapter 6, Article 10, A.R.S. § 45–114. Just as South West has no right to control the use of the water, so it cannot control the movement of water in natural water-bearing formations. *See Park County Sportsmen's Ranch, LLP*, 45 P.3d at 707.[8] It therefore can state no claim for trespass or a taking. Our resolution of this issue obviates the need to consider whether South West's claims are an impermissible collateral attack on the District's permits or whether South West's claims are barred by its failure to appeal the permits or object to the permits granted to the District.

### CONCLUSION

¶ 37 For the foregoing reasons, we affirm the grant of summary judgment on South West's taking and tort claims and deny South West's request for attorneys' fees on appeal.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge and ANN A. SCOTT TIMMER, Judge.

---

7. "Usufruct" is the "the right to use and enjoy the profits of property that belongs to another." *Davis v. Agua Sierra Res., L.L.C.*, 217 Ariz. 386, 392 n. 8, ¶ 22, 174 P.3d 298, 304 n. 8 (App.2008) (citing *Paloma Inv. Ltd. P'ship v. Jenkins*, 194 Ariz. 133, 138 n. 1, ¶ 22, 978 P.2d 110, 115 n. 1 (App.1998)).

8. South West cites a footnote in *Park County* that states: "We are not presented here with a cause of action in tort for interference with surface uses due to recharge that raises the groundwater table or with any claim to interference with the use and enjoyment of the Landowners' surface or subsurface estates." 45 P.3d at 714 n. 36. South West's claim is not for the actual use of the surface or subsurface, but is based upon an asserted right to control the movement of water beneath its properties. *Park County* rejected the "assertion of absolute ownership of everything below the surface of [property owners'] properties." *Id.* at 701.